STATE of Minnesota, Respondent,

v.

David Eugene WRIGHT, Appellant.

No. A03–1197.

Court of Appeals of Minnesota.

Sept. 3, 2004.

Mike Hatch, Attorney General, St. Paul, MN, and Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

John Stuart, State Public Defender, Leslie J. Rosenberg, Assistant Public Defender, Minneapolis, MN, for appellant.

Considered and decided by HUDSON, Presiding Judge; LANSING, Judge; and WILLIS, Judge.

## OPINION

LANSING, Judge.

A jury found David Wright guilty of one count of illegal possession of a firearm and two counts of second-degree assault. Wright argues that the district court abused its discretion in admitting as excited utterances statements made in a 911 call and statements that the complainants made to police who responded to the 911 call. Wright also argues that the statement he made in response to police force used to subdue him was not voluntary and should not have been admitted; that the court abused its discretion in ruling that he could be impeached with his prior convictions of drug crimes, damage to property, and aggravated robbery; and that the prosecutor committed prejudicial misconduct in closing argument. In supplemental briefing, the parties have addressed the Supreme Court's recent decision in *Crawford v. Washington*, —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). We affirm.

## FACTS

In November 2002, David Wright and his girlfriend, R.R., lived in an apartment in the Oak Grove area of Minneapolis. In the early morning of November 24, 2002, R.R. called 911 from the apartment to report that Wright had threatened her and her fifteen-year-old sister, S.R., with a handgun. Both R.R. and S.R. spoke to the 911 operator. On the 911 tape R.R. says that Wright "pulled a gun on me and my little sister" and that she is "so scared"; she is whispering, sobbing, stuttering, and, at times, unable to speak. S.R. is also crying and, at times, inaudible on the tape.

A police officer who had been dispatched to respond to an initial 911 hang-up call from the same address went to the area of the call and recognized Wright on the street from the description that the dispatcher was broadcasting as a 911 operator took R.R.'s and S.R.'s second 911 call. The officer demanded that Wright stop walking or the officer would release a police dog. Wright fled.

The officer testified that, as he followed in the squad car, Wright crossed through an intersection and the officer could see that in his right hand Wright was carrying what looked like a black, semiautomatic handgun. After catching up to Wright, the officer again warned him about the police dog as Wright continued running. The officer then released the dog from the back door of the squad car by remote control, and the dog pursued Wright and grabbed him by the leg. The officer left the car, drew his gun, told Wright to show his hands, and knocked him to the ground while the police dog continued the bite-hold on Wright's leg. In an effort to try to get Wright to move his hands away from his body, the officer kicked Wright in the chest. Wright then held out his hands and said, "I don't have the gun anymore."

Wright was handcuffed and taken to the hospital to be treated for the dog bite and other injuries he sustained in the chase. Additional officers responding to the call searched the area for a handgun and found a nine-millimeter, semiautomatic handgun under a car in a parking lot in Wright's flight path. In subsequent tests, no usable fingerprints could be obtained from the gun.

Another officer who had been dispatched on the original hang-up call and one who had been dispatched on the person-with-a-gun call went to R.R.'s apartment and spoke with R.R. and S.R. for about one-half hour. The officers described R.R. and S.R. as scared, crying, shaking, visibly upset, and struggling for composure. R.R.

and S.R. described the incidents leading up to the 911 call, indicating that Wright and R.R. had argued about their relationship and that Wright had become agitated when R.R. took his apartment keys and would not give them back to him. S.R. dialed 911, but Wright grabbed the telephone, ripped it from the wall, and smashed it. R.R. stated that Wright then retrieved a handgun from a bag in the front closet and pointed the weapon alternately at her and her sister; R.R. told the officers that she believed the gun was loaded. Wright then left the apartment, and R.R. called 911 using another telephone. During the interview, the officers located the bag in the front closet. The bag contained a gun clip that appeared to be for a nine-millimeter handgun and four hollow-point bullets that also appeared to be for a nine-millimeter gun.

Wright was charged with one count of felon in possession of a firearm and two counts of second-degree assault. At the evidentiary hearing, Wright's attorney objected to the prosecution's intention to use evidence of Wright's five previous felony convictions for purposes of impeachment if Wright testified. The district court denied the use of one conviction, a 1999 conviction for illegal possession of a firearm, because it was identical with one of the current charges and thus overly prejudicial. But the court authorized the use for impeachment of four other convictions: aggravated robbery, damage to property, and two controlled-substance crimes.

R.R. and S.R. did not testify at trial. Immediately before trial two representatives from the Hennepin County Victim/Witness Program and a police investigator testified to their repeated attempts to contact both R.R. and S.R. and to serve R.R. with a subpoena. R.R. told one of the representatives that she had "safety concerns for her sister and herself if they would have to testify." She said that Wright still had keys to her apartment and had repeatedly called her from jail saying if "she doesn't do what he wants someone will come over to her house and do something to her." The representative also testified that at a later time, R.R. stated in the presence of Wright's attorney that "the phone calls were not threatening to her."

The court ruled that R.R. and S.R. were unavailable witnesses and allowed into evidence, over objection, the tape of the 911 call, a transcript of the call, and the interviewing officers' recollections of R.R.'s and S.R.'s statements on the night of the incident. The court, after listening to the 911 tape and hearing the testimony of the two officers who talked to R.R. and S.R., ruled that the tape and the statements were excited utterances qualifying as exceptions to the hearsay rule under Minn. R. Evid. 803(2). In closing argument the prosecutor played parts of the 911 tape for the jury. Shortly after the jury began deliberations, they sent a message to the judge asking if they could listen to the 911 tape. Counsel waived their presence, and the jury returned to the courtroom and listened to the 911 tape.

The jury found Wright guilty of all three counts. He was sentenced to sixty months for each crime, to be served concurrently. Wright appeals his conviction.

**ISSUES**

I. Did the district court err by admitting statements by the complainants, who did not testify at trial, made in a 911 call and to police shortly after the incident?

II. Did the district court abuse its discretion by allowing into evidence Wright's statement that he did not "have the gun anymore"?

III. Did the district court abuse its discretion in allowing Wright to be impeached with his prior felony convictions?

IV. Did the prosecutor commit prejudicial misconduct in closing argument?

## ANALYSIS

A district court's evidentiary rulings lie within its sound judgment, and we will not reverse them on appeal absent an abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). If the court has erred in admitting evidence, we determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994). But if an evidentiary ruling involves constitutional error, we must look to the basis on which the jury rested the verdict and require a new trial unless the error is harmless beyond a reasonable doubt. *State v. Jones*, 556 N.W.2d 903, 910 (Minn.1996).

## I

Our review of a district court's admission of an excited utterance begins with Rule 803(2) of the Minnesota Rules of Evidence, which generally permits hearsay consisting of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In a criminal prosecution, any hearsay statements permitted under the rules of evidence have also been subject to restriction based on necessity and reliability, in recognition of a defendant's right "to be confronted with the witnesses against him" as provided by the Sixth Amendment to the United States Constitution. *State v. Byers*, 570 N.W.2d 487, 493 (Minn.1997) (citing *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980)).

Following Wright's trial and sentencing, the United States Supreme Court re-examined the admission into evidence of testimonial hearsay statements by witnesses in criminal trials. *See generally Crawford v. Washington*, 124 S.Ct. 1354 (2004) (abrogating *Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597). Under the prior rule of *Roberts*, the admission of an unavailable witness's statements against a criminal defendant at trial did not violate the Confrontation Clause, provided that the statements bore adequate indicia of reliability. 448 U.S. at 66, 100 S.Ct. at 2539. To meet that test, the statements had to either (1) fall within a "firmly rooted hearsay exception," or (2) bear "particularized guarantees of trustworthiness." *Id.*

In *Crawford*, the Supreme Court rejected the *Roberts* reliability analysis. Focusing instead on a defendant's procedural rights under the Confrontation Clause, the *Crawford* Court reasoned that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Crawford*, 124 S.Ct. at 1371. The Court traced the origin of the Confrontation Clause to the fundamental distinction between the common law and the "inquisitorial" practices of civil-law criminal procedure. *Id.* at 1359–60, 1363–64. The Court observed that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* at 1363. The Court stated that the Sixth Amendment right to confront one's accuser is not a substantive guarantee that may be satisfied by other means of ensuring the reliability of an accuser's statements but is procedurally

guaranteed to a criminal defendant. *Id.* at 1370. Thus, the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* The Court stated generally: "Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374.

■ Thus, under *Crawford,* the Sixth Amendment Confrontation Clause analysis now turns on whether a particular statement is "testimonial" in nature. If it is testimonial, the Confrontation Clause bars the prosecution from using it against a criminal defendant unless the declarant is available to testify at trial or the defendant had a previous opportunity to cross-examine the declarant. *Id.* at 1363–67, 1374. The Court held that this is so regardless of whether the statement falls within a state-law hearsay exception or bears indicia of reliability. *Id.* at 1369–72.

The Supreme Court did not provide a comprehensive definition of "testimonial," but stated that it would at the very least include prior testimony, whether at a hearing, trial, or grand jury proceeding, and police interrogations. *Id.* at 1374. The Court noted it was using "interrogation" in the "colloquial, rather than any technical legal, sense." *Id.* at 1365 n. 4 (citation omitted); *see The American Heritage Dictionary* 916 (4th ed.2000) (defining "interrogate" as "[t]o examine by questioning formally or officially").

In *Crawford,* the trial court admitted hearsay evidence derived from the custodial, *Miranda*-warned interrogation of the defendant's wife, who was a witness to the incident but unavailable to testify because of marital privilege and whose tape-recorded statements were allowed under the hearsay exception for statements against

penal interest. 124 S.Ct. at 1357–58 (citing Wash. Rule Evid. 804(b)(3) (2003)). The Court, in reversing, held that "interrogations by law enforcement officers fall squarely within" the category of "testimonial hearsay." *Crawford,* 124 S.Ct. at 1365.

Our facts do not involve a custodial, *Miranda*-warned interrogation. Instead, we address statements made by R.R. and S.R. to a 911 operator immediately after an assault and their on-the-scene statements to police officers a short time after the assault. We address first the question of whether the 911 call was "testimonial" evidence.

Although *Crawford* declined to "spell out a comprehensive definition of 'testimonial,'" *id.* at 1374, the Court noted three formulations of "core" testimonial evidence: (1) "ex parte in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior trial testimony not subject to cross-examination, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements" of the same nature "contained in formalized testimonial materials"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 1364 (quotations omitted); *see Horton v. Allen,* 370 F.3d 75, 84 (1st Cir.2004). The Court also provided examples of statements that would be included in the definition of "testimonial": (1) prior testimony at a preliminary hearing, before a grand jury, or at a former trial; (2) formal testimonial material such as affidavits, depositions, or confessions; and (3) a formal statement to government officers or statements taken by police officers in the course of interrogation. *Crawford,* 124 S.Ct. at 1364, 1374.

■ Analogizing from these examples, we conclude that the statements made during the 911 call, moments after the criminal offense and under the stress of that event, are not "testimonial" under *Crawford;* these statements do not fit within the definitions or the examples of "testimonial" statements. A 911 call is usually made because the caller wants protection from an immediate danger, not because the 911 caller expects the report to be used later at trial with the caller bearing witness—rather, there is a cloak of anonymity surrounding 911 calls that encourages citizens to make emergency calls and not fear repercussion. *See, e.g.,* Minn.Stat. § 13.82, subds. 4, 17(f) (2002) (classifying "a call placed to a 911 system for the purpose of requesting service from a law enforcement, fire, or medical agency" as private data on individuals).

The district court, after listening to the tape of the 911 call, found that R.R.'s and S.R.'s statements were excited utterances—that R.R. and S.R. were "trembling, stuttering, crying, [and] hyperventilating" during the call and that they were begging for help. The district court observed that "this is as much in the category of excited utterance and still [ ] coherent as I have ever heard." Even under the broadest definition of "testimonial" cited in *Crawford,* which focuses on whether an objective witness would reasonably believe the statement would later be available for use at trial, the 911 call does not qualify as "testimonial" evidence. Statements in a 911 call by a victim struggling for self-control and survival only moments after an assault simply do not qualify as knowing responses to structured questioning in an investigative environment in which the declarant reasonably expects that the responses will be used in later judicial proceedings. *See generally United States v. Saget,* 377 F.3d 223, 228–29 (2nd Cir. July 28, 2004).

Our conclusion is consistent with the majority of courts that have considered this issue. *See Leavitt v. Arave,* 371 F.3d 663, 683–84 n. 22 (9th Cir.2004) (reasoning that victim's excited utterance in emergency call to police was not "testimonial" because the victim, not the police, initiated their interaction and she was "in no way being interrogated" but instead "sought their help in ending a frightening intrusion into her home"); *Hammon v. State,* 809 N.E.2d 945, 952–53 (Ind.Ct.App.2004) (concluding that a domestic abuse victim's statements to police, made after victim called for help and police arrived and informally asked questions to determine what happened, were not "testimonial"); *People v. Conyers,* 4 Misc.3d 346, 777 N.Y.S.2d 274, 276–77 (N.Y.Sup.Ct.2004) (concluding 911 call placed by witness to a street fight was not "testimonial" because the witness's intention in placing the call, as evidenced by her "panicked and terrified scream[ing]," was to stop the fight and not to contemplate the future legal consequences of her statement); *People v. Isaac,* No. 23398/02, 4 Misc.3d 1001, 2004 WL 1389219, at *4–6 (N.Y.Dist.Ct. June 16, 2004) (distinguishing a 911 call placed to invoke prosecutorial action and one placed during the excitement of the criminal incident itself, recognizing that the latter might qualify as an excited utterance, which negates the characteristics required to make the statement "testimonial"); *People v. Moscat,* 3 Misc.3d 739, 777 N.Y.S.2d 875, 879–80 (N.Y.Crim.Ct.2004) (determining a 911 call by a domestic-assault victim was not "testimonial" because the statement was part of the criminal incident from which victim was seeking protection, and because such a call would typically not involve a person who is contemplating being a witness in future legal proceedings).

At least one court has held that a 911 operator may, particularly if trained to do

so, conduct the functional equivalent of a police interrogation. *See People v. Cortes,* 4 Misc.3d 575, 781 N.Y.S.2d 401 (2004) (reasoning that statements about an ongoing shooting made by witness during a 911 call amounted to "testimonial" evidence because the information was elicited by 911 operator's use of an accepted pattern of questioning for the purpose of investigation, prosecution, and potential use at judicial proceedings).

No evidence suggests, however, that R.R. and S.R.'s 911 call was handled under a formalized protocol. R.R. and S.R. were providing information for immediate intervention, not for eventual prosecution. The 911 dialogue is aimed at resolving an emergent situation by apprehending a threatening aggressor and providing R.R. and S.R. with information to ensure their safety. The district court did not abuse its discretion or violate Wright's Confrontation Clause rights by admitting the statements made in the 911 call.

The police officers accounts at trial of what R.R. and S.R. said at the apartment shortly after the call present a closer question. The first officer testified to his observations of R.R. and S.R.'s visible fear. He also made observations about the smashed phone and about the contents of a bag in the front closet that contained a clip for a nine-millimeter firearm and bullets for a nine-millimeter firearm. His testimony that S.R. said that the suspect pointed the gun at her and at her sister and that she was scared amounts to less than one page of the trial transcript. The officer said that he did not use a question-and-answer format, but he did ask S.R. if she could describe the gun. When he asked S.R. that question, officers in the street below were still attempting to find the gun.

The second officer testified that she had been dispatched on a 911 hang-up call and on the way received a dispatch that a female had called back from the same address and stated that her boyfriend pointed a gun at her. This officer described her visual perceptions of R.R.'s and S.R.'s emotional state. She described R.R.'s account of the argument about the apartment keys. She then testified in less than a page of transcript that Wright got a gun from the front closet; said, "Ill show you"; and pointed the gun at her sister and then at her, saying to her sister, "Little girl, shut your mouth." The officer also testified that R.R. said that she feared for her life. Finally, the officer described the retrieval of the black bag, bullets, and gun clip from the closet.

 To determine whether a defendant is entitled to a new trial because of a violation of a right to confront witnesses, we conduct a harmless-error analysis that considers " 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " *Jones,* 556 N.W.2d at 910 (quoting *State v. Pride,* 528 N.W.2d 862, 867 (Minn.1995) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986))). If the jury's verdict is surely unattributable to the challenged evidence, then any error is harmless beyond a reasonable doubt. *State v. King,* 622 N.W.2d 800, 809 (Minn.2001).

The second-degree assault charges require proof beyond a reasonable doubt that Wright, with a dangerous weapon, committed an act with intent to cause fear in another of immediate bodily harm or death on or about November 24, 2002, in Hennepin County. *See* Minn.Stat. §§ 609.222, subd. 1, 609.02, subd. 10 (2002).

The specific charges alleged that the act was done "while using or possessing a firearm."

It is not disputed that Wright, R.R., and S.R. were all present in an apartment in Oak Grove in Minneapolis at the time of the charged assaults. At trial, Wright testified extensively about the difficulties in his relationship with R.R., his anger at her and her sister on the night of the incident, and a confrontation over whether R.R. would give him back the keys to the apartment. Although Wright did not testify to exactly the same statements as R.R., he testified generally to his confrontational statements and that he had called S.R. "a bitch." He also testified that he ripped the phone from the wall and broke it because he believed S.R. was calling the police. He said that he left the apartment and was pursued by a police car, that he jumped a fence, and that a police dog grabbed his right leg. He denied saying anything about a gun and testified that he did not have a gun.

The jury found that Wright illegally possessed the gun, and the other evidence more than supports that finding beyond a reasonable doubt. The evidence includes a statement by Wright that "I don't have the gun anymore," the observations of the officer who saw the gun in Wright's hand when he crossed the intersection, the nine-millimeter handgun retrieved from under a parked car in Wright's flight path, a clip for a nine-millimeter gun and bullets for a nine-millimeter gun in a bag in the front closet of Wright's residence, and R.R.'s statements on the 911 tape that her boyfriend, David Wright, "has a gun" and "[H]e—he pulled a gun on me and my—my little sister (inaudible—crying)."

The remaining element is whether Wright, while using or possessing a firearm, acted "with intent to cause fear in another of immediate bodily harm or death." *See* Minn.Stat. § 609.02, subd. 10 (defining assault). "With intent to" means "that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(4) (2002).

The testimony is unanimous that Wright wanted to leave the apartment and that he wanted the keys to be able to get back into the apartment. R.R.'s and S.R.'s statements on the 911 tape vividly communicate that Wright had a gun, that he pulled that gun on R.R. and S.R., and that they are scared. The extent of their fear is certainly relevant evidence and it is overwhelmingly established by the 911 tape and the officers' description of their physical condition. The officer's testimony at trial that refers to R.R.'s and S.R.'s statements about their fear adds very little to the powerful evidence of the 911 call.

The officer's testimony of what R.R. and S.R. thought when the gun was pointed at them, again, is relevant, but it is Wright's *intent, not R.R.'s and S.R.'s thoughts* that defines the assault charge. What determines the final element is whether Wright, possessing or using a dangerous weapon, acted with an intent to cause fear. *See* Minn.Stat. §§ 609.02, subds. 9(4), 10; .222, subd. 1. The evidence on this, without considering R.R.'s and S.R.'s statements to police, is overwhelming. The contents of the 911 call made by the victims, the circumstances corroborating the statements made in that call, Wright's flight, the pursuing officer's testimony that he saw a gun in Wright's hand, the discovery of the handgun in the path of Wright's flight, and the physical evidence connecting the handgun to a gun clip and bullets in the closet of Wright's residence is all forceful evidence that shows beyond a reasonable doubt that Wright acted with intent to cause fear.

Although the police officers' testimony of what R.R. and S.R. said to them following the incident contributes to proof of the intent to cause fear, it is cumulative of the officers' accounts of what was happening as they apprehended Wright and the as-it-is-happening evidence of the 911 call. S.R.'s brief description of the gun as "dull silver with black," adds little, if anything, to the evidence. Before the officer testified, the gun had already been introduced into evidence through the testimony of the pursuing officer and the officer who found it. The officer's reference to S.R.'s brief description was not used as foundation or referred to again. The description adds little to the statements in the 911 call that Wright pulled a gun on R.R. and S.R., and Wright's possession of the gun was proved beyond a reasonable doubt without use of this evidence.

▪ For these reasons, we do not think it necessary to address whether the statements that R.R. and S.R. made to the police officers who responded to the 911 call are "testimonial" within the meaning of *Crawford.* The jury's verdict was surely unattributable to these consistent but cumulative statements, and any error in admitting that evidence would be harmless beyond a reasonable doubt.

We do not intend to suggest, however, that these statements, if reviewed, would be determined to be "testimonial." We are not convinced that a police response to an incident when the victims are in distress and primarily concerned with ensuring that their assailant has been apprehended satisfies any of the formulations or examples of testimonial hearsay provided by the Supreme Court. *Crawford,* 124 S.Ct. at 1364, 1374. This dialogue, although certainly part of an investigative process, is not an "interrogation" and does not result in a formal statement. *See, e.g., Hammon,* 809 N.E.2d at 952–53; *Fowler*

*v. State,* 809 N.E.2d 960, 964 (Ind.App. 2004) (applying rationale stated in *Hammon* ).

The narrative statements that R.R. and S.R. made to the officers were made minutes after their 911 call. Wright was taken into custody while they were still talking to the 911 operator and the officers who talked to R.R. and S.R. proceeded directly to their apartment after Wright was searched and placed in a squad. The district court found that R.R. and S.R. were still deeply affected by the startling events. Their demonstrated emotional distress—the very quality that justified the admission of their statements as excited utterances—is inconsistent with a determination that they were made with a belief that such statements "would be available for use at a later trial." *Crawford,* 124 S.Ct. at 1364.

The statements are fundamentally different from "testimonial" statements taken in anticipation of trial. They lack the formalized nature of a deposition, affidavit, interrogation, or grand jury testimony. R.R.'s and S.R.'s statements are highly unlikely to be calculated for effect in future legal proceedings. Their narrative statements following the stressful events are neither "solemn" declarations, *id.* (quotation omitted), nor accounts of a crime made "with an eye toward trial." *Id.* at 1367 n. 7. But because it is unnecessary to decide the testimonial or nontestimonial nature of the interview in this case, it is preferable to reserve that issue for a post-*Crawford* prosecution that allows the district court the opportunity to evaluate whether or not a particular interview or at-the-scene discussion with police is testimonial, rather than to decide it on supplemental briefs submitted in the middle of an existing appeal process.

▪ Finally, we note that because the district court ruled admissible both the 911

call and R.R.'s and S.R.'s comments to the police, the district court did not address and consequently we do not address whether Wright forfeited his right to confront R.R. and S.R. by procuring their absence from trial. *See generally State v. Fields*, 679 N.W.2d 341, 347 (Minn.2004) (discussing rule that defendant forfeits right of confrontation if he wrongfully procures the absence of the witness); Minn. R. Evid. 804(a).

## II

■ Wright argues that his unsolicited statement, "I don't have the gun anymore," was improperly admitted into evidence by the court because it was not voluntary but rather the product of police coercion. The district court denied Wright's motion to suppress the statement because it concluded that the statement was not the product of a custodial interrogation.

■ Whether a statement was voluntary is a question of law, which we review de novo. *State v. Ritt*, 599 N.W.2d 802, 808 (Minn.1999). "The voluntariness of a statement ... depends on the totality of the circumstances." *Id.* A statement is involuntary when police actions are so "coercive, manipulative and overpowering" as to deprive a suspect of the will to speak freely. *Id.*

The district court credited the officer's testimony that he had not questioned Wright about whether he had a gun prior to Wright's statement (thus a predicate to interrogation did not exist) and that the physical force was necessary to secure Wright and ensure that he was not holding the weapon. Because the officer saw a gun in Wright's hand when he first saw Wright, and Wright fled despite a warning, the officer was justified in the use of physical force to ensure that Wright was restrained. *See Graham v. Connor*, 490 U.S.

386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) (holding that threat posed by suspect is a factor in evaluating force used by arresting officer). Wright was properly subjected to physical force by the officer, and his statement was incidental to the apprehension. *See United States v. Carroll*, 207 F.3d 465, 472 (8th Cir.2000) (finding suspect's statement voluntary when given in response to gun-location question following apprehension by physical force and use of mace), *cert denied*, 531 U.S. 849, 121 S.Ct. 124, 148 L.Ed.2d 78 (2000). Therefore, Wright's statement that he no longer had a gun was properly admitted.

## III

■ Over Wright's objection, the district court admitted into evidence for impeachment purposes four of his prior felony convictions, excluding one conviction that was identical to one of the charged offenses (prohibited person in possession of a firearm). We review a district court's decision to admit evidence of prior convictions for impeachment purposes to determine if the court committed a clear abuse of discretion. *State v. Brouillette*, 286 N.W.2d 702, 707 (Minn.1979).

None of Wright's prior convictions directly implicates his credibility. But impeachment by prior felony convictions that do not involve "dishonesty or false statement" is permissible under Rule 609(a) of the Minnesota Rules of Evidence if "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect." The Minnesota Supreme Court has identified five factors to consider in weighing the balance:

(1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similari-

ty, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*State v. Jones,* 271 N.W.2d 534, 538 (Minn. 1978). The *Jones* court stated that such an analysis was necessary to prevent prosecutors from using "stale and irrelevant" crimes to deprive a defendant of the right to a fair trial. *Id.*

▮ The district court addressed all five *Jones* factors. Although the prior convictions were not directly relevant to credibility, that does not bar their use for impeachment purposes. *See State v. Gassler,* 505 N.W.2d 62, 67 (Minn.1993) (stating that impeachment by prior conviction allows the jury to "see the whole person and thus to judge better the truth of [a defendant's] testimony" (quotation omitted)). The district court demonstrated on the record that it had exercised the discretion accorded by rule 609(a) after considering and balancing the *Jones* factors. *See, e.g., State v. Lund,* 474 N.W.2d 169, 172 (Minn.App.1991). The court recognized the "prejudicial effect" inherent in impeachment by prior conviction. And the court instructed the jury before its deliberations that it should not consider evidence of prior convictions to be proof of guilt. We are satisfied that the court performed the balancing test that *Jones* requires and conclude that the district court did not abuse its discretion in admitting evidence of prior convictions for impeachment purposes.

**IV**

Wright argues that the prosecutor committed misconduct in rebuttal in arguing that S.R. and R.R. were absent from trial due to fear of Wright and in pointing to murder cases as examples of cases in which defendants procure the absence of their accusers.

▮ When assessing a claim of prosecutorial misconduct, we must first examine the challenged conduct to determine whether the prosecutor erred, and, if error is established, then we must determine whether the defendant is entitled to a new trial. *State v. Ford,* 539 N.W.2d 214, 228 (Minn.1995). Depending on the gravity of the error, we may review a claim of prosecutorial misconduct although an appellant failed to object at trial. *State v. Ives,* 568 N.W.2d 710, 713 (Minn.1997). We will generally not grant a new trial on this basis if the prosecutorial misconduct is harmless beyond a reasonable doubt. *State v. Bradford,* 618 N.W.2d 782, 798 (Minn.2000). Misconduct is harmless beyond a reasonable doubt if the jury's verdict is "surely unattributable to the error." *Id.* at 800 (quotation omitted).

Wright argues that the prosecutor's statement that R.R. and S.R. did not testify at trial because of fear was improper because R.R. had never said that Wright had threatened her. Wright's argument fails for two reasons. First, the prosecutor's statement did not link R.R. and S.R.'s absence to pretrial threats, but instead linked it to their fear on the night of the incident, as illustrated by the 911 tape. Second, the prosecution had provided evidence that R.R. had been threatened by Wright into not testifying. Given this evidence, and defense counsel's repeated reference in his closing argument to the state's failure to call R.R. and S.R., the prosecutor's statement was arguably a fair response. *See generally United States v. Flynn,* 196 F.3d 927, 930–31 (8th Cir.1999) (holding prosecutor is entitled to fair response in rebuttal to defense argument on state's failure to call witnesses); *cf. State v. Daniels,* 361 N.W.2d 819, 833 (Minn. 1985) (noting general rule that no adverse

inference may be drawn from failure to call witness equally available to either party).

Wright also argues that the following statement was misconduct: "As far as not being able to cross-examine [R.R. and S.R.], there are a lot of cases where the defense doesn't get to cross-examine the victim of a case. Sadly, it happens all too often. It's called murder." The prosecutor then stated that murders are prosecuted "year in and year out" and addressed the probative value of third-party evidence such as police interviews and 911 calls.

Wright argues that these statements exaggerate the criminality of his offense and imply that he committed more serious conduct. We agree that the reference to murder prosecutions was disproportionate and unnecessary. But we conclude that because the comment was so brief and because it supported a valid rebuttal argument, it does not warrant review in the absence of a defense objection. Even if the comment were sufficient to trigger review, the evidence, as we have previously stated, was so strong that the jury's verdict was surely unattributable to the error. The contents of the 911 call made by the victims, the circumstances corroborating the statements made in that call, Wright's flight, the pursuing officer's testimony that he saw a gun in Wright's hand, the discovery of the handgun in the path of Wright's flight, and the physical evidence connecting that handgun to a gun clip and bullets in the closet of Wright's residence provide overwhelming evidence of guilt.

## DECISION

The district court did not abuse its discretion or violate Wright's Confrontation-Clause rights in admitting the hearsay statements made in the 911 call. The hearsay statements made by the victims and testified to by police officers were consistent to and cumulative of other evidence and the jury's verdict was unattributable to these statements. The court also did not abuse its discretion in admitting Wright's statement about the gun or in admitting his prior convictions for impeachment purposes. Finally, the prosecutor's misconduct in closing argument was harmless beyond a reasonable doubt.

**Affirmed.**

HUDSON, Judge (concurring specially in part and dissenting in part).

I concur with the majority's conclusion that *this* 911 call is not testimonial evidence under *Crawford v. Washington,* 124 S.Ct. 1354 (2004). I write separately, however, out of concern that the majority's opinion may be read to suggest that *all* 911 calls are by definition not testimonial if they qualify as an excited utterance under Minn. R. Evid. 803(2) (2004). In my judgment, *Crawford* cannot be read that broadly.

The transcript of the 911 call, which was made immediately after appellant left R.R.'s apartment, plainly demonstrates that R.R. was extremely frightened and concerned for her safety. Significantly, R.R. stated that appellant had the keys to her apartment and that she feared he would return. R.R. simply wanted protection—nothing about the circumstances of the call suggests that she reasonably believed her statements would be available for use at a later trial. Thus, the call was properly admitted under *Crawford,* not because it was an excited utterance, but because it was not testimonial.

Prior to *Crawford,* a 911 call would routinely be admitted applying the standards for an excited utterance. Because the excited utterance was a firmly-rooted hearsay exception, it was generally accepted

that its admission did not violate the Sixth Amendment's Confrontation Clause. *See White v. Illinois,* 502 U.S. 346, 358, 112 S.Ct. 736, 744, 116 L.Ed.2d 848 (1992) (holding that Confrontation Clause is not violated when testimonial statements of child/victim of a sexual assault to an investigation police officer were properly admitted as spontaneous declarations). But the majority in *Crawford* observed the holding in *White* to be "arguably in tension" with the requirement of a prior opportunity to cross-examine the source of the testimonial hearsay. *Crawford,* 124 S.Ct. at 1368 n. 8. This is so because, as the majority acknowledges, the relevant inquiry now under *Crawford* is not whether the 911 call falls into a well-rooted hearsay exception such as the excited utterance exception, but whether the 911 call is testimonial in nature. *Id.* at 1363–67. If it is testimonial, it is irrelevant that the statement is also an excited utterance. *Id.* at 1369–71.

This distinction is more than just semantics. There will be, for instance, many cases where the 911 caller has multiple expectations and/or motives. In a domestic violence situation, for example, the caller, typically a woman, may genuinely be frightened, but nevertheless fully cognizant that what she says may be used by the state to investigate and prosecute the assailant. This is particularly true when the 911 call occurs hours or days after the assault. Depending on the circumstances, the call may still properly fall within the excited utterance exception. But it may also be testimonial because the caller is more likely to believe and/or understand that her statements will be used at a later trial; indeed that may be the primary purpose for the call. Similarly, some 911 calls are made specifically to invoke the investigation and prosecutorial function of the police. *See People v. Cortes,* 4 Misc.3d 575, 781 N.Y.S.2d 401 (2004) (holding that recording of 911 call made by eyewitness

to a shooting who was meticulously interrogated by 911 dispatcher was testimonial).

*Crawford* caused a paradigm shift, and the precise parameters of what constitutes testimonial evidence are unclear. But one thing is clear: reliability is no longer a substitute for cross-examination. *Crawford,* 124 S.Ct. at 1370. Therefore, trial courts must evaluate 911 calls on a case-by-case basis and may no longer admit out-of-court statements just because they happen to come within a statutory hearsay exception. *Crawford,* 124 S.Ct. at 1369. It is worth noting that the *Crawford* court recognized a single enduring exception under criminal hearsay law: the dying declaration exception. *Id.,* at 1367 n. 6. Conspicuously omitted was the excited-utterance exception. Thus, *Crawford's* holding was absolute: "Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374.

**The Police Interview**

Because the statements made by the victims in their interview with the police were testimonial and provided the police with new information not contained in the 911 call, I respectfully dissent from the majority's holding that the admission of these statements, even if error, was harmless beyond a reasonable doubt.

The trial court, of course, did not have *Crawford* before it when it decided to admit the victims' statements to the police as excited utterances. But based on *Crawford,* at least three of the cited definitions of "testimonial" evidence apply to the police interview of R.R. and S.R. The statements, taken by trained police officers approximately 30 minutes after the incident, were used for investigatory purposes and to support the complaint filed in this case.

Thus, the statements lie at the core of one definition of "testimonial" evidence cited by *Crawford:* a formal statement to government officers or statements taken by police officers in the course of interrogation. *Crawford,* 124 S.Ct. at 1374.

Initially, the officers simply asked the victims "what happened." But it is significant that they responded by giving detailed accounts of the argument leading up to the assault and the assault itself. Equally significant, one of the officers asked S.R. a very specific and critical question—he asked S.R. to describe the gun. In response, S.R. stated that the gun was a "dull silver with black automatic handgun." This description, which the jury heard only through the hearsay testimony of the police officer, closely matched the gun subsequently admitted into evidence at appellant's trial. The statement was plainly testimonial under *Crawford,* and appellant had a right to cross-examine S.R. concerning it.

Furthermore, there is little doubt that this was an interrogation. While the custodial "interrogation" in *Crawford* was clearly a formalized process, the Court emphasized that, to the extent that it had defined "testimonial," it was using "interrogation" in the colloquial, rather than any technical legal, sense. *Id.* at 1365 n. 4; *see The American Heritage Dictionary 944* (3d ed.1992) (defining "interrogate" as "[t]o examine by questioning formally or officially"). *See People v. Zarazua,* No. H025472, 2004 WL 837914, at *1, 4 (Cal.Ct.App. Apr. 20, 2004) (holding that victim's non-custodial taped interview with police one and one-half hours after "domestic battery" was testimonial). *Cf. Hammon v. State,* 809 N.E.2d 945, 952 (Ind.App.2004) (holding that statements made by victim immediately after the incident, at the scene, in response to informal questioning by police was not testimonial). Moreover, police of-

ficers responding to a call are certainly performing "official" duties, even if they are not necessarily "formal" ones. That this was also a standard, official criminal investigation is beyond question. Not only did the officers question the victims, they searched the apartment and took a bag from the front closet, a gun clip that appeared to be for a nine-millimeter handgun, four hollow-point bullets that appeared to be for a nine-millimeter gun, and the broken telephone. With the exception of the bag, all of this evidence was admitted at trial, as well as the nine-millimeter gun police found under the parked car near Wright's flight path.

The formality of the statements is further evidenced by the fact that the interviews took place approximately 30 minutes after the incident, the officers took notes which they used in their investigation, and the officers testified at the *Rasmussen* hearing from their notes and subsequent reports, using them to refresh their recollection when necessary. In addition, on cross-examination at the *Rasmussen* hearing, one of the officers testified that the interviews provided him with sufficient information to make an arrest. That the officers took notes itself suggests that this was not a casual conversation, and thus the statements also fell into a second *Crawford* example of "testimonial" statements: pretrial statements that the declarant would reasonably expect to be used prosecutorially. *Crawford,* 124 S.Ct. at 1364. And even if they were not deemed formal statements, the statements were made under circumstances which would lead an objective witness reasonably to believe that they would be available for use at a later trial— a third definition cited in *Crawford. Id.* Unlike the circumstances surrounding the 911 statements, here, the victims, while still understandably upset, knew that the appellant had been apprehended and that they were no longer in danger; indeed

they were sitting in the presence of two police officers. They had had time to reflect on the evening's events and provided detailed information to the police about the alleged assault—information a reasonable person would expect the government to use in the investigation and prosecution of the appellant.

But even if the time frame had been shorter, as the majority suggests, I believe that these statements were testimonial because (1) they were formal statements given to police officers in the course of interrogation; and (2) appellant had already been arrested and the police had begun gathering and inventorying evidence from the apartment in preparation for trial. Furthermore, while the amount of time that elapsed between the 911 call and the victims' interview is relevant, it is not dispositive of whether the statements were testimonial. *Crawford* makes clear that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse.... This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances." *Crawford*, 124 S.Ct. at 1367 n. 7. Thus under *Crawford*, these statements, even if also deemed excited utterances, were testimonial, and the trial court erred in admitting them without affording appellant an opportunity to cross-examine the declarants.

The majority argues that even if it was error to admit the statements, the error was harmless beyond a reasonable doubt because the statements were cumulative to the information provided by the victims in the 911 call, and because other evidence strongly corroborated the 911 call. Confrontation Clause violations are subject to harmless error analysis because "the Con-

stitution entitles a criminal defendant to a fair trial, not a perfect one." *United States v. Nielsen*, 371 F.3d 574, 581 (2004) (quoting *Delaware v. VanArsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). "Evidence erroneously admitted in violation of the Confrontation Clause must be shown harmless beyond a reasonable doubt, with courts considering the importance of the evidence, whether the evidence was cumulative, the presence of corroborating evidence, and the overall strength of the prosecution's case." *United States v. Bowman*, 215 F.3d 951, 961 (9th Cir.2000) (holding that introduction of co-conspirator's out-of-court statements was harmless considering the weight of the admissible evidence). *See also State v. King*, 622 N.W.2d 800, 809 (Minn.2001) (holding that error is harmless beyond a reasonable doubt only if the verdict is "surely unattributable" to the error) (quotation omitted).

Although cumulative on some points, the victims' police interview also provided the state with critical, new information not contained in the 911 calls—information that went directly to the issue of whether appellant intended to cause fear of immediate bodily harm or death; the key element in proving second-degree assault. Even as to the information that was cumulative, the police interviews fleshed out the victims' 911 statements on several significant points. For example, in the police interview, both victims stated that when appellant pulled the gun on them, they believed the gun was loaded and that he would shoot them. R.R. and S.R. also stated that appellant pointed the gun directly at them and said, "I'll show you," and "Little girl, shut your mouth." Both victims said that they were scared for their lives. None of these statements were in the 911 call, yet they bear directly on whether appellant intended to cause fear of immediate bodily harm or death. Simi-

larly, S.R. described the gun in the police interview but did not give a description of the gun in the 911 call. This is significant because appellant denied ever having a gun and did not have a gun on him when he was apprehended. Moreover, the police were unable to obtain any fingerprints from the gun found under the parked car and subsequently entered into evidence. In addition, both R.R. and S.R. stated that when S.R. tried to call 911, appellant grabbed the phone from her, pulled the cord out of the wall, and smashed the phone on the ground. None of this information was in the 911 call.

Furthermore, from the trial transcript it is clear that the prosecutor relied heavily on both the 911 call and the police interviews to carry the state's burden of proving that appellant acted with intent to cause fear of immediate bodily harm or death. Thus, in the prosecutor's summation, he told the jury that to believe defendant's testimony that he did not have the gun, the jury would have to reject probative evidence submitted by the state, including R.R.'s and S.R.'s statements to police that the defendant pulled the gun out of the closet and pointed it at them. Similarly, in response to defense counsel's claim that all the testimony in this case lacked credibility because the defendant never had an opportunity to cross-examine the declarants, the prosecutor repeatedly minimized the necessity for cross-examination by strongly suggesting that the 911 call and the police interview were inherently reliable because they qualified as excited utterances.

Admittedly, other evidence corroborated portions of the 911 call. The phone appellant broke when he snatched it from S.R. was admitted into evidence and appellant admitted smashing the phone because he did not want S.R. to call 911. But this evidence is only tangentially related, if at all, to whether appellant intended to cause fear of immediate bodily harm or death when he pointed the gun at the victims. And the fact that the evidence may be corroborative does not prove that its admission was harmless. *See King*, 622 N.W.2d at 809 ("inquiry is not 'whether a jury would have convicted the defendant, rather whether the error reasonably could have [had an impact on] ... the jury's decision' ") (quotation omitted).

Because neither R.R. nor S.R. testified at trial, the state's entire case rested on the 911 call and the victims' police interview. The interview elicited new information such as the description of the gun, appellant's threatening statements, and the victims' states of mind when the gun was pointed at them. The prosecutor stressed the significance and reliability of the victims' statements in the 911 call and the police interview. The statements from the police interview were testimonial under *Crawford*. In addition, they were extremely prejudicial to appellant, especially since the state's case rested heavily on the credibility of the victims. On this record, admission of the statements from the police interview was not harmless beyond a reasonable doubt, and appellant was denied a fair trial because he was not afforded the opportunity to cross-examine the victims. Accordingly, I would reverse appellant's conviction of second-degree assault and remand for a new trial.