STATE of Minnesota, Appellant,

v.

Farah Abshir WARSAME, Respondent.

No. A05–488.

Court of Appeals of Minnesota.

Nov. 21, 2006.

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, for appellant.

Mark D. Nyvold, Richard J. Malacko, St. Paul, MN, for respondent.

Considered and decided by MINGE, Presiding Judge; WILLIS, Judge; and STONEBURNER, Judge.

## OPINION

STONEBURNER, Judge.

On appeal from a pretrial order denying in large part the state's motion to admit statements an alleged victim made to police, this court reversed the district court's Confrontation Clause ruling and remanded for a determination of whether the statements were admissible under the hearsay rules. *State v. Warsame,* 701 N.W.2d 305, 307 (Minn.App.2005), *review denied* (Minn. Oct. 26, 2005). After the Minnesota Supreme Court denied review, the United States Supreme Court granted certiorari, vacated this court's opinion, and remanded for consideration in light of *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). *Warsame v. Minnesota,* —— U.S. ——, 126 S.Ct. 2983, 165 L.Ed.2d 985 (2006). We again reverse and remand.

## FACTS

Eden Prairie police officer John Wilson responded to a 911 call concerning conduct at appellant Farah Warsame's address. On his way to Warsame's address, Officer Wilson was flagged down by a woman who was walking in the middle of the street two or three houses away from Warsame's address. As soon as Wilson stopped his car, the woman stated, "My boyfriend just beat me up." Officer Wilson determined that the woman, N.A., was associated with the call for which he was dispatched and began to assess her injuries. He saw a large bump on her head that was swollen, red, and appeared fresh. Wilson had N.A. sit on the curb, grabbed his first-aid bag, and started giving N.A. medical attention.

A second police officer, Sergeant Olson, arrived on the scene. As N.A. gave a description of her assailant to Officer Wilson, Sergeant Olson broadcast that description to other squad cars nearby. Police were following Warsame's vehicle, and had been doing so since just after he drove away from the residence.

Meanwhile, N.A. told Officer Wilson that she had been choked. Wilson asked N.A. "some form of open-ended question of what happened." In response, N.A. gave a narrative account, telling Wilson

that her boyfriend came home. She wanted to talk. He was tired and did

not want to talk. They began to argue. And he had gone into the kitchen and grabbed a cooking pot and had struck her in the head with it.... [A]fter he hit her, she fell on the bed, and he then got on top of her and was choking her, and her sisters came up and attempted to get her boyfriend off the top of her. At that time her boyfriend went into the kitchen, got a knife and came back after her and threatened to kill her, chased her from room to room.

About three to five minutes after Sergeant Olson had arrived at the scene where Officer Wilson was talking to N.A., and after relaying N.A.'s description of Warsame to police who were following Warsame, Sergeant Olson went to Warsame's residence to check on the welfare of N.A.'s sister, I.A. He found that I.A. had only a small cut on her finger and did not need medical assistance.

N.A., who was crying and shaking as she talked to Officer Wilson, said she was very frightened and believed Warsame was going to kill her. She said that she was three months pregnant but did not believe she sustained any injuries that could harm the baby. She said Warsame left in a car with one of her sisters. N.A. told Wilson she had been walking to the police department to report the assault because the telephone was inoperable.

Warsame was charged with domestic assault and terroristic threats. When N.A. failed to respond to a subpoena to testify at Warsame's trial, the state moved to admit her statements to police.

The district court classified the statements taken by police into three groups: (1) N.A.'s statements to Officer Wilson, consisting of the initial volunteered statement, "My boyfriend just beat me up," the statement that she was choked, and N.A.'s full account of what happened; (2) I.A.'s statements to Sergeant Olson; and (3) I.A.'s later statements to Officer Wilson. The district court ruled that N.A.'s initial, volunteered statement, "My boyfriend just beat me up," was not testimonial. The court then ruled that all subsequent statements by N.A. and I.A., because they were made in response to questions from police, were "testimonial," and therefore inadmissible under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), unless the witnesses testified at trial. The district court found that after N.A.'s initial statement she "knew that she was no longer in danger," that she had by then had "sufficient time to reflect on the evening's events," and that she provided information "that a reasonable person ... could expect to be used prosecutorially." The state appealed the district court's rulings with regard to N.A.'s statements that were suppressed by the district court.

This court reversed, applying the Supreme Court's analysis in *Crawford*, this court's analysis in *State v. Wright*, 686 N.W.2d 295, 305 (Minn.App.2004), *aff'd* 701 N.W.2d 802 (Minn.2005),[1] and cases from other jurisdictions. *Warsame*, 701 N.W.2d at 308–11. This court held that the district court erred in concluding that "N.A.'s statements were testimonial simply because they were given in response to some questioning by the officer." *Id.* at 311. This court also held that the district court erred in "finding that the [police] questioning 'was clearly done to obtain evidence that could be used at trial.'" *Id.* Finally, this court concluded that the circumstances of N.A.'s statement did not bring it

---

1. Along with this case, the U.S. Supreme Court vacated the Minnesota Supreme Court's decision in *State v. Wright*, 701 N.W.2d 802 (Minn.2005) and remanded it to the supreme court. *Wright v. Minnesota*, —— U.S. ——, 126 S.Ct. 2979, 165 L.Ed.2d 985 (2006).

within any of the alternative formulations of "testimonial" statements set out in *Crawford.* *Id.* at 312. As noted above, the Minnesota Supreme Court denied review but the United States Supreme Court granted certiorari, vacated this court's opinion, and remanded for consideration in light of *Davis.*

### ISSUE

Were N.A.'s statements to police "testimonial" in light of *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)?

### ANALYSIS

■ This court generally reviews evidentiary rulings for a clear abuse of discretion. *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003). But the Supreme Court's remand presents a legal issue that the district court did not have before it.

The focus of *Crawford* was, first, on enunciating a new rule that "testimonial" statements by declarants who do not testify at trial and whom the defendant has had no prior opportunity to cross-examine violate the Confrontation Clause. Second, the Crawford Court noted three alternative formulations of a definition of "testimonial" statements, and offered several examples of "testimonial" statements, including statements taken by police in the course of interrogation. *Crawford v. Washington,* 541 U.S. 36, 51–52, 68, 124 S.Ct. 1354, 1364, 1374, 158 L.Ed.2d 177 (2004).

The Supreme Court in *Davis v. Washington* began its analysis with a discussion of what might constitute "interrogation." —— U.S. ——, ——, 126 S.Ct. 2266, 2274, 165 L.Ed.2d 224 (2006). The Court examined whether statements made to police in two companion cases, one involving a 911 call, the other an on-the-scene police investigation, were testimonial or non-tes-

timonial. *Id.* at 2276, 2278. The Court defined when police interrogation produces testimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74.

■ The police interview with N.A. in this case constituted police interrogation. It occurred in the course of an on-the-scene police investigation similar in circumstances to that involved in the companion case in *Davis, Hammon v. Indiana.* Therefore, we need not address any of the alternative formulations of "testimonial" statements in *Crawford.* 541 U.S. at 51–52, 124 S.Ct. at 1364.

In addressing the police interrogation in *Hammon,* the Supreme Court concluded that "the interrogation was part of an investigation into possibly criminal past conduct." *Davis,* 126 S.Ct. at 2278. The Court noted that, although police were responding to a call of a domestic disturbance, there was "no emergency in progress," partly because the complainant said things were fine, and because, although not formal, the "interrogation was conducted in a separate room, away from [the complainant's] husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].'" *Id.*

The *Davis* Court distinguished the statements made in *Hammon* from those made in *Davis* during a 911 call:

The statements in *Davis* were taken when [the complainant] was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. [The complainant in *Davis*]'s present-tense statements showed immediacy: Amy's narrative of past events was delivered at some remove in time from the danger she described.

*Id.* at 2279.

The state does not argue that all of N.A.'s statements were taken during an "ongoing emergency" like the statements held to be non-testimonial in *Davis*. And Warsame does not argue that all of the statements were offered to prove past events relevant to a criminal prosecution, as in *Hammon*. The issue, in applying Davis to this case, is where to draw the line, in the chronology of N.A.'s statements, between non-testimonial and testimonial statements. Both parties appear to agree that the initial, volunteered statement, "My boyfriend just beat me up," is, as the district court found, non-testimonial.

Under *Davis*, we must distinguish between questions asked "to enable police assistance to meet an ongoing emergency" and questions asked when there is no ongoing emergency and the questions are asked to "establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273–74. The emotional state of N.A., the formality of the questions, and the nature of the questioning, remain relevant. *See id.* at 2277 (concluding questions were asked to deal with an ongoing emergency in part because the declarant's answers were "frantic" and were provided "in an environment that was not tranquil"). But the overriding question is whether there was an ongoing emergency. *See id.* at 2276–77 (analyzing the 911 call in *Davis*).

As noted above, it is undisputed that an "ongoing emergency" existed at some point(s) during N.A.'s encounter with police. The issue is when the purpose of the questioning became one of obtaining information about past events "potentially relevant to later criminal prosecution." *Id.* at 2274.

*Davis* and *Hammon* involved police response to domestic disturbances involving a single victim and a single suspect. The police learned, in the middle of the 911 call in *Davis*, that the assailant was leaving, *id.* at 2271; and in *Hammon*, the suspected assailant was in the house but separated, in another room from the victim, during the on-the-scene interrogation. *Id.* at 2278. By contrast, the situation confronting police here was more complex. Although Warsame had left the scene of the alleged assault, he was reported to be with one of the victim's sisters, and the other sister, possibly injured, remained at the scene of the alleged assault, which was a short distance from where the questioning of N.A. occurred. In this case, unlike the situations in *Davis* and *Hammon*, police faced possible emergency situations regarding three locations: the street curb, where N.A. was being attended to, the house nearby, where her sister I.A. remained, and the fleeing vehicle, where another sister was with Warsame.

█ We conclude that the "ongoing emergency" referred to in *Davis* as marking out-of-court statements non-testimonial need not be limited to the complainant's predicament or the location where she is questioned by police. As long as a possible emergency situation, occurring at another location or involving another person, is related to the complainant's own situation and is one which can be clarified by questioning her, the purpose of the questioning may be considered as for the primary purpose of enabling police assistance

to meet an ongoing emergency, making the complainant's statements non-testimonial.

The situation at Warsame's residence, where I.A. was located, was not clarified until Sergeant Olson left the curb where N.A. was talking with Officer Wilson and went to the house, where he found that I.A. was not seriously injured. The situation of the other sister was clarified only when police had stopped and detained Warsame. The *Rasmussen*-hearing testimony did not focus on the chronology of these events. But based on that testimony, and reasonable inferences from it, we conclude that there was still an "ongoing emergency" when N.A. related to police the critical narrative account of the incident.

Warsame argues that the state misrepresents the facts on this critical point, and that N.A. did not tell police that her sister had been kidnapped by Warsame. Officer Wilson's *Rasmussen* testimony does not indicate that N.A. explicitly indicated that the sister with Warsame was in danger. But there is a reasonable inference, based on the account of Warsame's actions towards N.A., and her sisters' attempted intervention, that N.A. was concerned about the safety of her sister who was in the car with Warsame.

Warsame argues that the emergency was resolved, and the purpose of police questioning had turned toward establishing past events for purposes of possible criminal prosecution, when Officer Wilson elicited, and Sergeant Olson broadcast, the basic details describing Warsame and the vehicle he was driving. But police began following Warsame's vehicle almost as soon as it left the driveway, and were in a position to stop it at any time. While the descriptions provided grounds for a stop, the emergency at that location was due to the presence of N.A.'s sister in the vehicle, possibly against her will, and police might have been facing a hostage situation that could not be resolved merely by stopping the vehicle.

We conclude, based on the *Rasmussen*-hearing testimony, that, given the complex situation facing police, there was an "ongoing emergency" at least up until the time when Sergeant Olson left the curb. At that point, Sergeant Olson had not yet determined that there was no emergency at the house, where he knew I.A. remained. And police had not yet determined that there was no emergency regarding the sister who was a passenger in Warsame's vehicle.

Warsame argues that the *Rasmussen* hearing transcript establishes that N.A. had not delivered her critical narrative account of the incident before Sergeant Olson left because otherwise he would have mentioned it in his testimony. But Officer Wilson, who was focused on what N.A. said and would have had a far better memory of the details, was available at the *Rasmussen* hearing to testify about N.A.'s narrative account. And it appears that Sergeant Olson was focused on the details he needed to broadcast to other units, such as suspect and vehicle descriptions, which would not have included the details of N.A.'s narrative.

In any event, Sergeant Olson did testify at the *Rasmussen* hearing that he heard N.A. say that a knife was involved in the assault. This was part of N.A.'s narrative account, as described by Officer Wilson. The fact that Sergeant Olson remembered N.A. mentioning a knife is a strong indication that he heard the narrative account of the incident before he left the curb. Although the district court may reopen the record on remand, the record on appeal indicates that there was an ongoing emergency when N.A. gave her narrative account, such that the narrative account was non-testimonial.

The circumstances surrounding N.A.'s statements support the conclusion that they were made in the midst of an "ongoing emergency." As this court stated in its earlier opinion, "N.A. was crying, shaking, and very upset, [and] the 'questioning' by Wilson was in the form of an open-ended question about what happened...." *Warsame*, 701 N.W.2d at 309. Moreover, N.A. gave a narrative account of the incident, and Officer Wilson did not take notes of the conversation, except for N.A.'s name and date of birth. *Cf. Davis*, 126 S.Ct. at 2277 (contrasting the 911 call in that case with the statement in *Crawford* given "calmly" at the police station, with the officer "making notes of [the declarant's] answers").

■ The state argues that N.A.'s statements should not be treated as any less contemporaneous with an ongoing emergency than those in the 911 call in *Davis* because in this case Warsame had cut the phone line. The state applies a forfeiture analysis to Warsame's conduct at the scene, citing *Davis.* But the forfeiture-by-wrongdoing referred to in *Davis* is that which arises from a defendant's procuring the witness's absence *at trial. See id.* at 2279–80 (noting vulnerability of domestic-abuse victims to "intimidation or coercion of the victim to ensure that she does not testify at trial"); *see generally State v. Byers,* 570 N.W.2d 487, 494 (Minn.1997) (affirming holding that defendant procured witness's unavailability at trial and thereby waived his right to object to admission of his out-of-court statement). The defendant's conduct at the scene, insofar as it limits the witness's communications with police at the time, does not support a finding of forfeiture of his rights under the Confrontation Clause.

As discussed above, we conclude that Warsame's right to confrontation would not be violated by admission of N.A.'s narrative account of the alleged assault. Police were dealing with an "ongoing emergency" potentially extending to three separate locations when they spoke with N.A. at the curb and when she gave her narrative account of the incident. Under *Davis,* all of N.A.'s statements up to and including the critical narrative account are non-testimonial. This includes the initial, volunteered statement that the district court ruled admissible, N.A.'s description of Warsame and his vehicle, her statement that she had been choked, and her narrative account.

Although the district court has already determined that N.A.'s statements to Officer Wilson are excited utterances under Minn. R. Eivd. 8.03(2), on remand, the district court may reopen the record for additional evidence and findings on the Confrontation Clause issue.

## DECISION

The district court erred in concluding that N.A.'s statements, beyond an initial, volunteered statement, were testimonial for purposes of the Confrontation Clause and, therefore, inadmissible. Based on the record available on appeal, all of the statements, including N.A.'s narrative account of the incident, are non-testimonial.

**Reversed and remanded.**