STATE of Minnesota, Respondent,

v.

Farah Abshir WARSAME, Appellant.

No. A05–488.

Supreme Court of Minnesota.

July 26, 2007.

Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, Lori Swanson, Attorney General, St. Paul, MN, for appellant.

Mark D. Nyvold, Richard J. Malacko, St. Paul, MN, for respondent.

## OPINION

ANDERSON, Paul H., Justice.

The state charged Farah Abshir Warsame with one count of domestic assault

and one count of making terroristic threats. The charges related to an incident with Warsame's girlfriend, N.A. At a *Rasmussen* hearing, the district court concluded that most of N.A.'s statements to the police were inadmissible at trial. The state appealed, and the Minnesota Court of Appeals reversed, concluding that all of the statements were admissible. We denied Warsame's petition for review. The United States Supreme Court granted Warsame's writ of certiorari and vacated the court of appeals decision, remanding the case for reconsideration in light of *Davis v. Washington,* 547 U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Upon remand, the court of appeals again reversed the district court's ruling. We granted Warsame's petition for review and affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

Shortly after midnight on October 24, 2004, the Eden Prairie Police Department received a 911 call from an individual concerning an incident at a neighboring home, located less than two blocks from the police department. Officer John Wilson responded to the call, and as he approached the address where the 911 call originated, he encountered a woman walking in the middle of the street. Before Wilson was able to get out of his car or speak to the woman, she stated, "My boyfriend just beat me up." Wilson quickly determined that the woman, whom he later identified as N.A., was related to the 911 call. He also observed that N.A. was upset, crying, and holding the left side of her head. Wilson then moved N.A.'s hand from her forehead and observed that she had a fresh bump on her head about the size of a baseball. The bump was swollen and red. Wilson also noted that N.A. appeared "wobbly" and "potentially faint," so he had her sit down on the curb.

Wilson retrieved his emergency medical treatment bag from his squad car and began checking N.A.'s head and neck area. He observed fresh bruising on her neck, and as he did so, N.A. stated that she had been choked. While Wilson administered first aid, he asked N.A. what he described as "some form of open-ended question of what happened," and Wilson testified that N.A. gave the following response:

> She told me that her boyfriend came home. She wanted to talk. He was tired and did not want to talk. They began to argue. And he had gone into the kitchen and grabbed a cooking pot and had struck her in the head with it. And after * * * he hit her, she fell on to the bed, and he then got on top of her and was choking her, and her sisters came up and attempted to get her boyfriend off the top of her. At that time her boyfriend went into the kitchen, got a knife and came back after her and threatened to kill her, chased her from room to room. She affirmed that she was very frightened and believed he was going to kill her.

Wilson called an ambulance. During the approximately 15 to 20 minutes before an ambulance arrived, Wilson learned more information from N.A. She told Wilson that she was pregnant, after which Wilson attempted to assess if N.A.'s pregnancy may have been affected by the alleged assault. N.A. also stated that after the assault, her boyfriend had "left in her vehicle with one of her sisters."

N.A. explained to Wilson that she could not call 911 because the phone lines in her home had been cut, and as a result she walked toward the police department in order to report the assault. Wilson testified that N.A. provided most of this information in a "story-like fashion," and that he asked only a few "small questions" toward the end in order to obtain extra

detail. Wilson testified that N.A. was "crying and physically shaking" throughout his entire encounter with her. Wilson recalled writing down N.A.'s name, date of birth, and telephone number while he was speaking with her, but he did not recall whether any additional notes he took were written before or after the paramedics arrived.

Police Sergeant Robert Olson arrived at the scene one to three minutes after Wilson. Olson observed Wilson assisting N.A. as she was seated on the curb, and he noticed that N.A. was crying and "heaving heavily." He also saw a large lump on her head. Olson used his portable radio to relay to other police units responding to the 911 call some of the information that N.A. was giving to Wilson about the suspect's description. Olson heard N.A. describe her assailant, who was identified as the respondent, Farah Abshir Warsame, and state that a knife was involved in the assault, which information Olson reported over his radio. Olson also heard N.A. state that a third party had been cut with the knife. Olson stated that he took no notes during this time.

Olson testified that Warsame was not in police custody during the time he was listening to the exchange between Wilson and N.A. But Olson had learned that another Eden Prairie police officer had responded to the 911 call and that officer observed an SUV-type vehicle leaving the home where the alleged assault had taken place. Olson learned that the officer was following the vehicle, which was apparently traveling at a high speed. The vehicle, driven by Warsame, was later stopped about two miles from N.A.'s home.

Olson testified that he remained near Wilson and N.A. for three to five minutes and then went to the home where the assault allegedly occurred. After entering the home, he spoke with one of N.A.'s sisters, I.A., who was apparently present during the alleged assault. Olson stated that he observed a cut on I.A.'s finger, which was not bleeding.

Wilson testified that during the 15 to 20 minutes he spent with N.A., he learned "early on" that Warsame had been apprehended. Wilson stated that he learned this shortly after Olson broadcasted Warsame's name and description over the police radio, but Wilson did not recall if Olson was still nearby when Wilson learned that Warsame had been apprehended.[1] Wilson did not recall ever telling N.A. that Warsame was in police custody.

After the paramedics arrived to assist N.A., Wilson also entered N.A.'s home and spoke with I.A. It was during this conversation that Wilson learned that during the assault, I.A. had attempted to grab a knife from Warsame, was cut, and passed out from the injury.

Both N.A. and I.A. failed to respond to subpoenas from the state to testify at Warsame's trial, so the state moved to admit their statements to Officer Wilson and Sergeant Olson. After conducting a *Rasmussen* hearing where Wilson and Olson both testified, the district court concluded that N.A.'s initial statement to Wilson, that her boyfriend beat her up, was not testimonial under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), but all subsequent statements by N.A. and I.A. were testimonial and therefore inadmissible because they violated Warsame's rights under the Confrontation Clause. With the exception of the initial statement, the court concluded that the

---

**1.** Wilson apparently learned of Warsame's apprehension over a police radio, but the record is not clear on this point.

statements N.A. made to Wilson were taken "to obtain evidence that could be used at trial" and made while N.A. knew that she was safe in the presence of a police officer. The court also concluded that the statements I.A. made to Olson and Wilson were for the purpose of providing evidence and therefore testimonial.

The state appealed the district court's ruling to the court of appeals, arguing that all of N.A.'s statements were admissible under *Crawford*. *State v. Warsame* (*Warsame I*), 701 N.W.2d 305, 307 (Minn.App. 2005). The state did not appeal the district court's suppression of I.A.'s statements to Wilson and Olson. The court of appeals reversed the district court's ruling on the suppression of N.A.'s statements, concluding that none of the information N.A. gave to Wilson was testimonial, and N.A.'s entire statement was therefore admissible under *Crawford*. *Warsame I*, 701 N.W.2d at 312–13. The court of appeals determined that statements made in response to questions from a police officer are not necessarily testimonial, and there was no evidence in the record to support a finding that the purpose of Wilson's questions was to obtain evidence for trial. *Id.* at 311. We denied Warsame's petition for review.

Warsame then filed a writ of certiorari to the U.S. Supreme Court. The Court granted the writ, vacated the court of appeals decision, and remanded the case to the court of appeals for reconsideration in light of the Court's intervening decision in *Davis*, 547 U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224. *Warsame v. Minnesota*, —— U.S. ——, 126 S.Ct. 2983, 165 L.Ed.2d 985 (2006).

After reconsideration, the court of appeals again concluded that all of N.A.'s statements to Wilson were admissible. *State v. Warsame* (*Warsame II*), 723 N.W.2d 637, 643 (Minn.App.2006). The court based its decision on its determination that there was an "ongoing emergency" throughout the encounter between Wilson and N.A. because the police had not yet resolved emergencies both in the home, where there was a potentially injured victim, and in Warsame's vehicle, where N.A.'s sister was a passenger. *Id.* at 642. But the court acknowledged that the record was not clear on whether those emergencies ended before completion of N.A.'s statements, which information would further inform the court's determination of whether those statements continued to be nontestimonial. Therefore, the court of appeals remanded to the district court with the direction that the district court may reopen the record to obtain additional evidence. *Id.* at 643. Warsame then petitioned our court for review.

## A. Standard of Review

▮ Warsame argues that all of N.A.'s statements were testimonial and should therefore be ruled inadmissible at trial. We generally will not reverse a district court's evidentiary rulings absent a clear abuse of discretion. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn.2006). But whether the admission of evidence violates a defendant's rights under the Confrontation Clause is a question of law that we review de novo. *Id.*

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford*, the Supreme Court concluded that this clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53–54, 124 S.Ct. 1354. Although the Court concluded that

it was unnecessary to endorse any particular formulation of what constituted a testimonial statement, the Court noted that included among the "core class" of such statements were "pretrial statements that declarants would reasonably expect to be used prosecutorially," and "[s]tatements taken by police officers in the course of interrogations." *Id.* at 51–52, 124 S.Ct. 1354 (internal quotation marks omitted).

### B. Recent Case Law

#### 1. U.S. Supreme Court Decision in *Davis/Hammon*

Two years after its decision in *Crawford,* the Supreme Court in two companion cases—*Davis/Hammon*—was asked to determine "precisely which police interrogations produce testimony." 126 S.Ct. at 2273.[2] In *Davis/Hammon,* the Court articulated the following rule to distinguish between testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74 (footnote omitted). The facts in each of the two companion cases are helpful in understanding this rule, so we will address them separately.

The *Davis* case involved a domestic assault victim's statements to a 911 operator while the assault was occurring in the victim's home. *Davis/Hammon,* 126 S.Ct. at 2270–71. During the 911 call, the victim responded to a series of questions from the operator and then told the operator that her assailant was leaving the home in a car. *Id.* at 2271. At that point, the operator told the victim to stop talking and proceeded to ask the victim questions about the assailant and the assault. *Id.* The Court concluded that at the very least, the victim's statements up until she told the operator that the assailant was driving away from the home were nontestimonial because the circumstances objectively indicated that the primary purpose of those statements was to enable police to meet an ongoing emergency. *Id.* at 2277.

In the *Davis* case, the Supreme Court cited four objective factors that indicated the victim's statements were made to meet an ongoing emergency: (1) the victim described events as they actually happened and not past events; (2) any "reasonable listener" would conclude that the victim was facing an ongoing emergency; (3) the questions asked and answers given were necessary to resolve a present emergency, rather than only to learn what had happened in the past; and (4) there was a low level of formality in the interview because the victim's answers were frantic and her environment was not tranquil or safe. *Id.* at 2276–77. The Court further noted that the victim was seeking aid, not telling a story. *Id.* at 2279. Although the Court was not required to determine whether statements made after the assailant had driven away were testimonial, the Court noted that a conversation which begins as an interrogation to determine the need for emergency assistance can evolve into testi-

---

**2.** In *State v. Wright,* we referred to the *Davis v. Washington* opinion as *Davis/Hammon,* and then referred to the individual cases as *Davis* and *Hammon,* for the purpose of avoiding confusion. 726 N.W.2d 464, 472 n. 2 (Minn. 2007). We continue that practice here.

monial statements once that former purpose has been achieved. *Id.* at 2277.

In *Hammon*, the Supreme Court concluded that all of a domestic assault victim's statements to the police were testimonial. 126 S.Ct. at 2278. In the *Hammon* case, the police came to the victim's home and found the victim and her assailant in separate places, and the police kept the assailant and the victim in separate rooms while the victim was questioned. Id. at 2272, 2278. The Court noted that under the facts in *Hammon*, there was no emergency in progress when the police arrived at the victim's home because the victim assured the police that things were fine "and there was no immediate threat to her person." *Id.* at 2278.

In *Hammon*, the Supreme Court also observed that during the officer's questioning of the victim, the officer was determining what *happened,* not what was *happening. Id.* In addition, there was a formal aspect to the mode of questioning because the victim's statements were deliberately recounted in response to the officer's questions and took place some time after the events described occurred, which the Court noted are circumstances more characteristic of an investigation. Id. But the Court made a final observation that police questions at the scene of a domestic dispute can yield nontestimonial answers because the police " 'need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.'" *Id.* at 2279 (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.,* 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)).

### 2. *State v. Wright*

On a remand from the Supreme Court, we applied the *Davis/Hammon* principles in *State v. Wright,* 726 N.W.2d 464 (Minn. 2007). *Wright* involved a 911 call and victim interviews. Wright allegedly pulled a gun and pointed it at his girlfriend, R.R., and her sister before leaving the apartment Wright and R.R. shared. *Wright,* 726 N.W.2d at 467, 470. R.R. called 911, told the operator how she had been threatened, described Wright in response to the operator's questioning, and then asked her sister to speak with the operator after the operator told R.R. that the police had arrived at the apartment. *Id.* at 467–68. After determining where R.R. and her sister were in the building and notifying R.R.'s sister that the police had sighted Wright and were following him, the operator learned that Wright was in police custody and informed R.R.'s sister of this fact. *Id.* at 468. Then, in response to R.R.'s sister's concerns and questions, the operator comforted and assured the sister that the situation was under control. *Id.* Following Wright's arrest, police officers conducted a "field investigation interview" of both R.R. and her sister at the apartment. *Id.* at 469.

We concluded in *Wright* that the police interviews were testimonial but that the entire 911 call was nontestimonial. Id. at 475–76. Regarding the interviews, we stated that as in *Davis/Hammon,* by the time the interviews occurred, the emergency had ended because Wright was in custody. 726 N.W.2d at 476. We therefore concluded that the interviews were conducted to "establish events potentially relevant" to Wright's prosecution. *Id.* Regarding the 911 call, we specifically addressed whether the 911 call should be divided between testimonial and nontestimonial statements, but we concluded that it was not necessary to do so. *Id.* at 474. We concluded that the emergency was ongoing until Wright was in custody, and even after Wright was in custody, the

"sole purpose" of the remainder of the call was to calm R.R.'s sister and not to establish or prove past events. *Id.* at 474–75 (distinguishing the facts from those in *Davis*).

### C. Were N.A.'s Statements Testimonial or Nontestimonial?

It is within the context of the foregoing case law that we must determine whether N.A.'s statements to Wilson were testimonial or nontestimonial. When making this determination we must decide whether there was an ongoing emergency when the statements were made.

#### 1. N.A.'s Initial Statement to the Police

Warsame argues that the district court incorrectly concluded that N.A.'s initial, volunteered statement that her boyfriend beat her up was nontestimonial because N.A.'s primary concern in making the statement was to supply information relevant to criminal prosecution. According to Wilson's testimony, when N.A. made the statement, she was walking toward the police station to report the assault.

 Volunteered statements may be testimonial. *See Davis/Hammon,* 126 S.Ct. at 2274 n. 1. But in this case, the objective circumstances surrounding N.A.'s initial statement indicate that she did not make the statement to Officer Wilson with the prosecution of Warsame in mind. After having been struck on the head with a pan and choked, N.A. attempted to call 911 but was unable to do so because the telephone lines in her home had been cut. N.A. left her home and took to the street with injuries at a time when she was in obvious distress and when Warsame was still at large. These are not

circumstances indicating that N.A.'s primary purpose for talking to the police was to prosecute Warsame, as that purpose could have been achieved after she recovered for a period of time and sought medical attention. Instead, N.A. was seeking help by walking to the police department, located approximately two blocks from her home. We conclude that N.A.'s initial, volunteered statement is nontestimonial and therefore admissible at Warsame's trial.

#### 2. N.A.'s Subsequent Statements— Was There an Ongoing Emergency?

We next consider the statements N.A. made to Wilson after the officer's initial encounter with N.A. Warsame argues that there was no ongoing emergency during Wilson's conversation with N.A. and that Wilson's primary purpose in interrogating[3] N.A. was to gather evidence for a criminal prosecution. Therefore, Warsame argues that N.A.'s statements to Wilson during the interrogation were testimonial.

Warsame asserts that there was no ongoing emergency during the interrogation because, similar to the facts in *Hammon,* N.A. was separated from her alleged assailant and had police protection. The state responds by arguing that there were three ongoing emergencies during the interrogation: (1) N.A.'s medical condition; (2) Warsame's flight; and (3) I.A.'s potential medical condition inside the home. We consider each of these potential ongoing emergencies.

##### N.A.'s Medical Condition

 Regarding N.A.'s medical condition, we first note that neither

---

**3.** In *Davis/Hammon,* the Supreme Court defined "interrogation" broadly, to encompass police questioning in a colloquial sense. 126 S.Ct. at 2273. Neither party disputes that

N.A.'s statements following her initial, volunteered statement were part of an interrogation under this definition.

*Davis/Hammon* nor *Wright* involved a victim with potential medical concerns. But applying the principles articulated in *Davis/Hammon*, if "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," then N.A.'s statements are nontestimonial. 126 S.Ct. at 2273. We conclude that questions addressing a victim's medical condition may qualify as an interrogation designed to meet an ongoing emergency. As first responders to emergencies, police are often required to assess a party's injuries and determine whether those injuries must be immediately addressed and whether the party requires additional assistance from paramedics or other health care professionals. In order to make that assessment, officers must inevitably learn the circumstances by which the party was injured, and if the circumstances of the questions and answers objectively indicate that gaining such information is the primary purpose of the interrogation, then the party's statements are nontestimonial. We acknowledge that information about a victim's injury and its cause may be useful in a later prosecution, but for Confrontation Clause purposes, it is the primary purpose of the interrogation that is dispositive.

■ Here, the objective circumstances of the interrogation indicate that the primary purpose of at least the initial part of the interrogation was to enable Wilson to address N.A.'s medical condition. After seeing N.A. and starting to assist her, Wilson had N.A. sit down because she was wobbly and potentially faint. Wilson then retrieved his emergency medical treatment bag, an act that indicates Wilson had concluded there was a medical concern. In order for Wilson to properly address the bump on N.A.'s head and the bruising on her neck, there is no question that the circumstances under which N.A. was phys-

ically hurt were relevant. There was no level of formality to the interrogation, N.A. was crying and shaking throughout, and the location of the exchange was a roadside curb. Although N.A. told Wilson about the alleged assault in the past tense rather than the present tense, this temporal context was necessary for Wilson to learn the circumstances under which N.A. was injured. Further, N.A.'s condition was severe enough that Wilson called an ambulance to the scene. Finally, Wilson addressed the concern of N.A.'s pregnancy and how that might have been affected by the alleged assault. We conclude that Wilson's questions and N.A.'s answers, at least so far as they pertained to N.A.'s treatment, were necessary to resolve N.A.'s apparent medical emergency.

### Warsame's Flight and I.A.'s Medical Condition

■ The state also argues that Warsame's flight from the scene of the alleged assault and I.A.'s potential medical condition inside the house constituted ongoing emergencies. Warsame argues that there were no ongoing emergencies because N.A. was under police protection and Warsame was being pursued as soon as the interrogation began. Warsame further argues that any emergency cannot be expanded beyond N.A.'s situation because *Davis/Hammon* defines emergency narrowly to include only "an immediate and continuing threat," not "[p]ossible concerns and emergencies." We conclude that the *Davis/Hammon* test should not be interpreted so narrowly.

In effect, Warsame interprets the *Davis/Hammon* test to circumscribe what may constitute an ongoing emergency to a narrow geographic proximity, based on the declarant's location. We acknowledge such an interpretation comports with the facts in *Davis, Hammon,* and *Wright,* but

we conclude that the Supreme Court did not intend to restrict what may constitute an ongoing emergency to such a limited area. For example, in *Davis/Hammon*, the Court observed that in response to domestic disputes, officers " 'need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' " 126 S.Ct. at 2279 (quoting *Hiibel*, 542 U.S. at 186, 124 S.Ct. 2451); *see also* 126 S.Ct. at 2276 (stating that in order to resolve a present emergency, law enforcement may have to establish an assailant's identity "so that the dispatched officers might know whether they would be encountering a violent felon" (citing *Hiibel*, 542 U.S. at 186, 124 S.Ct. 2451)). Although the police in the *Hammon* case were encountering the alleged assailant at the scene of the crime, where the victim remained, the necessity to assess the assailant and any threat to personal safety is equally applicable when the police are pursuing that assailant outside of the victim's proximity.

Courts in other jurisdictions have concluded that ongoing emergencies may exist beyond the declarant's geographic proximity, even when police are with the declarant and particularly when a dangerous suspect remains at large. *See State v. Kemp*, 212 S.W.3d 135, 149 (Mo.2007) (concluding that a victim's statements were not testimonial where she described her assailant's possible location, stated that the assailant was armed with a gun, and stated that he was on drugs, which warned the police of "possible erratic or dangerous behavior upon arrival"). In *State v. Ayer*, the New Hampshire Supreme Court concluded that a witness's statements were nontestimonial when the interrogating officer did not know where the perpetrator was, whether he was armed, whether the perpetrator might have other targets, and whether the violence might continue elsewhere. 154 N.H. 500, 917 A.2d 214, 224–25 (2006). The court concluded that such information was necessary for the officer to "address an existing threat to his safety and the safety of others." *Id.* at 224.

■ We conclude that extending an emergency beyond the declarant's geographic proximity comports with the fundamental concern the Supreme Court considered in *Davis/Hammon*, which was distinguishing between interrogations by the police for the purpose of addressing ongoing emergencies and interrogations for the purpose of gathering evidence for trial. We conclude that if the objective circumstances of the interrogation indicate that the primary purpose is to address an ongoing emergency, regardless of where that emergency is occurring, a declarant's statements are nontestimonial. In order to meet this standard, the interrogation must relate directly to addressing the emergency. If the interrogator is not eliciting information that may be useful in addressing the ongoing emergency, then it cannot be maintained that the interrogation's primary purpose is to address that emergency.[4]

■ Applying the foregoing rules to the facts in this case, we conclude that Warsame's flight and I.A.'s potential medical condition both constitute ongoing emergencies. Viewed objectively, N.A.'s statements caused the police to address the two other exigencies created by the alleged assault. First, N.A.'s identification of Warsame and her description of the as-

---

4. To the extent that the dissent believes the state failed to demonstrate its burden under *Davis/Hammon*, we note that the state presented its evidence at the *Rasmussen* hearing approximately 15 months before the Supreme Court articulated the primary purpose test in *Davis/Hammon*.

sault enabled Olson to report the suspect's name and possible weapon to the officers in pursuit, which, as in *Kemp* and *Ayer*, provided those officers with more information to better address that situation.[5]

Second, N.A.'s statement revealed that a third party—I.A.—had been cut by a knife during the assault, which information, when viewed objectively, may have caused Olson to enter the house earlier than he would have without that information. N.A.'s statement apparently did not provide insight into the severity of I.A.'s condition, so further investigation was necessary to ensure there was no ongoing medical emergency inside the house. It is objectively reasonable to conclude that an emergency existed in that location until Olson was able to conclude that emergency medical assistance was unnecessary.

The objective circumstances under which the interrogation was conducted further buttress our conclusion that the primary purpose of the interrogation was to address ongoing emergencies. While Wilson was questioning N.A., he did not recall taking any notes other than N.A.'s name, birthday, and telephone number, and Wilson's questions were not specific and thorough, as one might otherwise expect when interrogating a crime victim. Also, while Olson was present at the interrogation, he took no notes and instead dispatched information over his police radio that was helpful to the pursuit of Warsame. These are not objective indications that the officers were primarily gathering evidence for a criminal prosecution.

Based on the foregoing analysis, we conclude that the court of appeals correctly concluded that there were three ongoing emergencies while N.A. was being interrogated: (1) N.A.'s medical condition; (2) Warsame's flight; and (3) I.A.'s medical condition.

3. Did the Ongoing Emergencies End at Some Point?

 Warsame argues that even if there were ongoing emergencies for purposes of our Confrontation Clause analysis, those emergencies ended in a short time and did not last the entire 15– to 20–minute interrogation. As previously noted, an interrogation that begins for the purpose of determining the need for emergency assistance can evolve into testimonial statements once that purpose has been achieved. *Davis/Hammon*, 126 S.Ct. at 2277.

---

**5.** The parties argue about whether it is proper to infer that N.A.'s other sister, the passenger in Warsame's vehicle, was kidnapped, but the inference is unnecessary. A high speed pursuit and apprehension of a *potentially danger-ous* suspect qualifies as an emergency, regardless of whether a kidnapping is involved. To the extent that the court of appeals inferred that the car passenger was in danger, *Warsame II*, 723 N.W.2d at 642, we conclude that there must be an objectively reasonable basis in the record to make such an inference. Here, the record does not objectively support such an inference because, based on Wilson's testimony, N.A. never gave any indication that her sister was in danger or kidnapped.

More generally, Warsame argues that it was improper for the court of appeals to make any inferences that there were other ongoing emergencies based on Wilson's and Olson's testimony without explicit evidence. But such a rule would ignore the principle holding of *Davis/Hammon*, that declarant statements during the course of a police interview are nontestimonial if the primary purpose is to address an ongoing emergency. In the normal course of operation, law enforcement officials must make inferences from witness and victim interrogations to determine whether there are other exigencies that must be addressed. Courts cannot determine whether the primary purpose of an interrogation was to address an ongoing emergency unless the court similarly infers, based on objectively reasonable circumstances in the record, whether the police had an emergency to address.

■ The state has the burden of proving that a particular statement does not violate a defendant's Sixth Amendment rights. *State v. Burrell,* 697 N.W.2d 579, 600 (Minn.2005) (citing *State v. King,* 622 N.W.2d 800, 807 (Minn.2001)). Here, the state must demonstrate that N.A.'s statements were made before the emergencies ended, and if all emergencies ended before the 15– to 20–minute interrogation concluded, the state must demonstrate which of N.A.'s statements were made before those emergencies ended.[6]

Based on Olson's testimony, Warsame was not apprehended and I.A.'s condition was uncertain until just after Olson left Wilson and N.A. But the chronology of facts that N.A. had given at that point is not clear. The court of appeals concluded that N.A.'s "narrative account" of the assault recounted by Wilson, which apparently refers to the block quotation recited in the fact section above, was made within the time before Olson left. *Warsame II,* 723 N.W.2d at 642. Because Olson heard N.A. refer to the knife, and information about the knife was given in this narrative account, the court of appeals concluded that the narrative account was nontestimonial. *Id.*

■ According to Wilson, the narrative account was elicited through his initial, open-ended question, "what happened?" Because the apprehension and possible victim emergencies did not end before Olson left the curb, anything he heard N.A. say, which included the suspect's description, the use of a knife in the assault, and an injury to a third party, must have been said before those emergencies ended. But the record is not clear as to whether Olson

stayed for the entire narrative account, and if he left during the account, what information he may have missed. In addition, Olson remembered hearing facts from N.A. that Wilson did not testify to hearing at the *Rasmussen* hearing, including Warsame's physical description and that a third party was injured inside N.A.'s home. Based on those discrepancies, it is difficult to delineate a chronology for what N.A. said at what time. The only certainty from this record is that N.A.'s initial, volunteered statement to Wilson was nontestimonial, and everything Olson heard N.A. say was said before Warsame was apprehended and I.A.'s medical status was verified.

### D. Conclusion

We conclude that under the *Davis/Hammon* primary purpose test, N.A. made nontestimonial statements up to the point Warsame was apprehended and Olson verified I.A.'s medical status. The record reflects that Olson's testimony about what N.A. said was all nontestimonial, but because Wilson's testimony lacked chronological development, the record is unclear regarding what Wilson heard N.A. say that might be nontestimonial. Therefore, before the state is allowed to admit N.A.'s statements through Wilson's testimony, other than the initial, volunteered statement and those statements that conform to what Olson heard, the state must demonstrate that the statements were made before the emergencies at issue ended. We hold that the court of appeals erred when it concluded that all of N.A.'s statements were nontestimonial and admissible in court. Because neither the state nor the

---

6. In addition, we note that the state must ordinarily demonstrate that each of the declarant's statements pertains to the applicable ongoing emergencies in each case, and any testimonial statements should be redacted.

*See Davis/Hammon,* 126 S.Ct. at 2277, *Wright,* 726 N.W.2d at 473 n. 4. Based on our review of the record in this case, all of N.A.'s statements pertained to the ongoing emergencies.

district court had the benefit of the rules articulated in *Davis/Hammon* and *Wright* at the *Rasmussen* hearing, we remand to the district court so that the court may make a determination in a manner consistent with those cases and our holding in this case, including whether any part of N.A.'s statement was made after the emergencies ended.[7] The district court may develop the record in any manner it deems appropriate.

Affirmed in part, reversed in part, and remanded.

PAGE, Justice (concurring in part, dissenting in part).

While I do not disagree with the court's remand, I cannot on this record conclude that the state met its burden of showing that there were any ongoing emergencies or that the primary purpose of Officer Wilson's questioning was to address an emergency and not to establish facts relevant to the future prosecution of Warsame. Therefore, I dissent in part.

Unlike the victims in *State v. Wright*, 726 N.W.2d 464 (Minn.2007), all of N.A.'s statements were made while she was under police protection and while her injuries were being attended to. In order for courts to determine whether there is an ongoing emergency and whether the officers' questions related to that emergency, the state must demonstrate the chronology of the relevant events and statements, and the specific questions asked by the officers and the responses elicited by those questions. A one-paragraph summary of a 15– to 20–minute conversation without any evidence of the specific questions asked of the victim or any way of knowing the events occurring while the victim was providing those statements is insufficient to meet the state's burden under *Davis v. Washington*, 547 U.S. ——, 126 S.Ct. 2266, 2273–74, 165 L.Ed.2d 224 (2006).

It is also important to point out that, in order for a statement to qualify as nontestimonial under *Davis*, the state must show both that there was an ongoing emergency and that the questions asked related to that emergency and not to establishing facts necessary for future prosecution. Id. at 2273–74. In my view, N.A.'s statement that a knife was involved in the assault and that a third party was cut, without more, is not enough to show that there was such an emergency. Further, it is clear from the record that the officers did not ask any questions regarding her sister I.A. Absent such questions, I do not see how the state can make a showing that the officers' questions were aimed at addressing I.A.'s situation and not at establishing facts to be used in a future prosecution of Warsame. Accordingly, I would conclude that the state failed to meet its burden of showing that N.A.'s statement regarding I.A. was nontestimonial.

---

7. Warsame notes that the district court concluded that N.A.'s statements qualified as an excited utterance, an exception to hearsay. Warsame argues that this has no impact on the analysis before this court. We agree. The Supreme Court stated that testimonial statements are *not admissible in court because* they meet a hearsay exception, except dying declarations. *Crawford*, 541 U.S. at 56 & n. 6, 124 S.Ct. 1354.

The state argues that under the rule of forfeiture, Warsame waived *his right to argue* that admission of N.A.'s statements violate the Confrontation Clause because he *cut* the phone line, preventing N.A. from calling 911. First, there is no evidence in the record to suggest that it was Warsame who cut the phone line. Second, the rule of forfeiture *pertains to a defendant procuring the absence* of a witness *at trial*. *Davis/Hammon*, 126 S.Ct. at 2280; *Wright*, 726 N.W.2d at 479. There is no evidence in the record that suggests Warsame procured N.A.'s unavailability in this case.

Finally, I would note that, unlike *Wright,* a case in which the victims feared that the defendant would return to the apartment to harm them, 726 N.W.2d at 473–75, there is nothing in the record here that suggests that when N.A. made the statements at issue in response to Officer Wilson's questions she believed Warsame was still a potential threat to her. Furthermore, once again, there is nothing in the record indicating what specific questions the officers asked with regard to Warsame and thus there is no way to conclude that the primary purpose of their questions was to resolve some ongoing emergency with respect to Warsame.

For these reasons, I concur in the remand, but, unlike the court, am unable on this record to conclude that any of the questions asked by the police had the primary purpose of addressing any ongoing emergencies.