*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1748**

State of Minnesota,
Respondent,

vs.

Jerome Anthony Woodland,
Appellant.

**Filed June 17, 2024**
**Affirmed**
**Ede, Judge**

Hennepin County District Court
File No. 27-CR-21-9018

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Nicole Cornale, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Cochran, Presiding Judge; Ede, Judge; and Smith, John,

Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**EDE**, Judge

In this direct appeal from a final judgment of conviction for second-degree intentional murder, appellant maintains that the district court erroneously admitted (1) a 911 call made by the victim reporting an alleged assault by appellant three days before the murder and (2) a Facebook Live video made by appellant two days before the victim was killed. Because we conclude that the district court did not abuse its discretion by admitting the challenged evidence, we affirm.

## FACTS

This case arises from the fatal stabbing of N.R. on April 7, 2021. The following factual summary is based on the salient pretrial record and the evidence adduced at trial.

### *Relevant Events Preceding April 7, 2021*

Appellant Jerome Anthony Woodland and N.R. first met when N.R. bought drugs from Woodland. The two later developed a romantic relationship.

On April 4, 2021, N.R. called 911, reporting that Woodland threw two bricks at her. N.R. told the 911 dispatcher that she just wanted the authorities to know what had occurred and that she was "tired of going through this sh-t with [Woodland]." Although the dispatcher asked if N.R. needed an ambulance, N.R. responded: "No, I don't, I'm limping and I'm walking home. It was a heavy-a-- brick[.]" N.R. also declined to meet with law enforcement but stated that she hoped the police would talk to Woodland. N.R. requested a call back because she wanted to know what happened.

Between April 4 and April 5, 2021, Woodland made several Facebook Live videos in which he recorded himself angrily ranting and cursing. Woodland created the video at issue in this appeal on April 5, two days before N.R.'s death.

In the subject video, Woodland says that he feels like he has "53 years of just anger built up" inside him. Woodland also states that he wants to hurt someone "real, real, real, real bad" and that he did "not really car[e] about the consequences." Later in the video, Woodland says that, if somebody was to speak with him, "too bad," he would try to kill them. Woodland notes that he is serious and "in a mood." Woodland further states: "You already knew why that stuff happened the other day[.] Why you had to call the police[,] because guess what[,] you're trynna stop this here." Woodland then turns the camera to show his face and displays folded cash in his hand. And the video shows Woodland saying: "I bet that b--ch sorry she tried . . . because a couple more inches this b--ch would have brain damage."

### Events of April 7, 2021

On the morning of April 7, 2021, Woodland, N.R., and Woodland's friend, D.S., were at D.S.'s home, using drugs. D.S. left the residence at some point. Before D.S. departed, Woodland, N.R., and D.S. were the only people inside D.S.'s home. When D.S. returned, he found N.R. dead in the back bedroom.

Around that time, a neighbor overheard loud, quick, heavy footsteps—which sounded "like they were in a panic"—on the hardwood floor of D.S.'s unit. The neighbor assumed "a fight was starting" because that happened "from time to time" between Woodland and N.R. when they visited D.S.'s home; alternatively, the neighbor thought

that someone might have overdosed. The neighbor also heard "raised" and "panicked" voices," including D.S. asking: "What happened? . . . What's going on?" According to the neighbor, Woodland responded in a high-pitched, excited, and panicked voice: "Call 911. Call 911."

Three 911 calls reported the incident. The first 911 call came in at 12:31 p.m. from Woodland's phone, although Woodland did not identify himself. The caller reported a need for an ambulance at D.S.'s residence and pleaded sixteen times for the dispatcher to hurry. D.S. placed the second and third 911 calls from his phone at 12:31 p.m. and 12:39 p.m., respectively. In the 12:31 p.m. call, D.S. stated that "somebody is . . . bleeding" and exclaimed: "What the h-ll has happened here?" D.S. also reported that he "just came in the door and she's bleeding all over the place." In the 12:39 p.m. call, D.S. stated that he had called earlier and needed an ambulance, saying: "I just got home, there's blood all over the floor and I think she's dying. . . . She's laying on the bathroom floor and there's blood all over the place."

The paramedics arrived and entered D.S.'s home after the third 911 call. D.S. directed them into the residence but was "very vague about what happened." Woodland was not present and D.S. told one of the paramedics that no one else was home when D.S. had returned to the residence. When one paramedic noted a bloody shirt on the living room floor and asked D.S. about it, D.S. denied knowing the person to whom the shirt belonged. The paramedics found N.R. in a back bedroom, laying on her back covered in blood. N.R. was not breathing, did not have a pulse, and her heart had no electrical activity; the

4

paramedics did not administer care to N.R. because they determined that those efforts would have been futile. The paramedics determined that N.R. was dead.

The paramedics called for police, who responded to the scene. Law enforcement processed the scene and found drug paraphernalia related to crack cocaine throughout the residence. When an officer asked D.S. if anyone else had been home with N.R., D.S. said "no." Law enforcement noted that D.S. did not have any blood-like substance on his person. An officer also observed that D.S. was not very forthcoming with information. D.S. later admitted to law enforcement that Woodland was present at D.S.'s home when the stabbing occurred and that he returned home to find Woodland with N.R., who was bleeding, and no other people present. D.S. also stated that Woodland left through the back door after telling D.S. to call 911 and to "be sure she stays conscious."

Cell phone data and surveillance footage ultimately revealed that Woodland and N.R. left N.R.'s apartment complex in the early morning hours of April 7 and that Woodland was at D.S.'s residence before and during the first two 911 calls. Forensic scientists also identified a latent print on a glass bottle at D.S.'s home as belonging to Woodland and matched the bloody shirt found on D.S.'s living room floor to a gray long-sleeved shirt that surveillance video shows Woodland was wearing.

A medical examiner later determined that N.R.'s cause of death was "sharp force injury of the chest" and that the manner of her death was "homicide." Based on a four-centimeter-wide wound found on N.R., the medical examiner opined that N.R. had been stabbed with a blade that had a single sharp edge and had suffered a single "straight in and straight out" stab. N.R. also had "sharp force injuries" or incisions on her right hand, which

the medical examiner believed might or might not have been defensive wounds. Although N.R.'s autopsy revealed that she also had cocaine and hydroxyzine in her system, the medical examiner determined that those substances did not contribute to N.R.'s death.

Prior to Woodland's surrender to authorities, Woodland's sisters and mother told law enforcement that Woodland had called them right after N.R. was stabbed, and one of Woodland's sisters said that Woodland was possibly planning "suicide by cop." Woodland's sister also provided police with the April 5 Facebook Live video at issue in this appeal and told law enforcement that she believed the footage depicts Woodland referring to hurting N.R. Woodland ultimately turned himself in about a month after N.R.'s stabbing.

Respondent State of Minnesota charged Woodland by amended complaint with second-degree intentional murder, in violation of Minnesota Statutes section 609.19, subdivision 1(1) (2020), and second-degree murder without intent—while committing a felony, in violation of Minnesota Statutes section 609.19, subdivision 2(1) (2020), for his involvement in the stabbing of N.R.

***Pretrial Motion and Hearing***

Before trial, Woodland's counsel filed a motion in limine requesting that the district court prohibit the state from offering the 911 call N.R. made on April 4 and from offering any of Woodland's Facebook Live videos. In a memorandum accompanying the motion, defense counsel argued: (1) that the 911 call was inadmissible because it was not an excited utterance under Minnesota Rule of Evidence 803(2); (2) that admission of the 911 call

6

would violate Woodland's right to confrontation; and (3) that the call's probative value was substantially outweighed by the danger of unfair prejudice.

After reviewing the 911 call and hearing the parties' arguments at a pretrial hearing, the district court determined that the 911 call was an excited utterance based on N.R.'s "combination of anger, fear, [and] frustration[,] recounting an event that just occurred" and that "the purpose of the 911 call was to meet an ongoing emergency." The district court therefore ruled that the 911 call was admissible.

Defense counsel then argued that inclusion of the Facebook Live videos was more prejudicial than probative because the videos showed Woodland's state of mind on April 5, not his state of mind on April 7—the day of N.R.'s death. The state, on the other hand, sought to introduce the longest Facebook Live video to establish Woodland's state of mind before the incident and requested admission of the two shorter Facebook Live videos to provide context to the longest video.

The district court ruled that the shorter videos were inadmissible. As for the longest video, the district court found that Woodland was "admitting his state of mind, which [was] relevant to the . . . situation two days later." The district court determined that the longest video did "indicate a state of mind, at least when the video was made" and that the video had a "significant amount of relevance and probative value of a statement of intent two days before [the murder], . . . especially when it [was] more of a statement of general intent, not just, 'I'm going to do this tonight.'" Ultimately, the district court determined that the video's probative value outweighed any unfair prejudice and therefore ruled that the video was admissible.

*Trial, Conviction, and Appeal*

At trial, the state introduced evidence of the foregoing facts, including the subject 911 call and Facebook Live video. Woodland testified in his own defense, describing the series of events preceding the stabbing and the murder itself as follows.

As to the events of April 4, Woodland acknowledged that he had had an "incident" with N.R. on that date. Woodland admitted to smoking crack cocaine at D.S.'s home on April 4 with N.R. and "a bunch of people[.]" Woodland said that he told N.R. to leave, but she refused because she wanted to keep smoking crack. Woodland stated that he and N.R. ended up throwing "rocks" at each other.

As to the April 5 Facebook Live video, Woodland testified that he was very high when he made it and that he was not proud of what the recording showed. Woodland also claimed that N.R was not the focus of the video. Instead, Woodland stated that he was upset that the father of N.R.'s twins repeatedly called his phone.

Turning to the events of April 7, Woodland confirmed that he had been at D.S.'s home using drugs with N.R. and D.S. on the morning of N.R.'s stabbing. After D.S. left Woodland and N.R. at the home, Woodland looked out the window and noticed a vehicle, which he believed was owned by a man who had given him a ride to an ATM earlier that morning. Woodland thought that the man planned to rob him, so he grabbed a knife from the kitchen. With the knife in hand, Woodland told N.R. to get behind him, and he began to search the home.

At some point, Woodland noticed that N.R. was not standing by him anymore but was smoking crack in one of the other rooms in the home. While Woodland's body was

8

facing N.R., he looked over his shoulder into a bedroom. When Woodland looked down and back up, N.R. was "right on [him] with the knife inside her." Woodland let go of the knife and N.R. pulled it out of her chest, causing a significant loss of blood. A few moments later, N.R. fell to the floor. Woodland tried to stop the bleeding and called 911. When Woodland heard sirens, he tried to clean up the drugs in the home and then fled before the paramedics arrived.

The jury found Woodland guilty of both counts. The district court adjudicated Woodland guilty of count one—second-degree intentional murder. Count two—second-degree felony murder—remained unadjudicated as a lesser-included offense. The district court committed Woodland to the Commissioner of Corrections for 366 months.

This appeal follows.

**DECISION**

Woodland challenges the district court's admission of N.R.'s April 4 call to 911 and one of the Facebook Live videos that Woodland recorded on April 5.

"Evidentiary rulings rest within the sound discretion of the district court, and [appellate courts] will not reverse an evidentiary ruling absent a clear abuse of discretion." *State v. Ali*, 855 N.W.2d 235, 249 (Minn. 2014). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Vangrevenhof*, 941 N.W.2d 730, 736 (Minn. 2020) (quotation omitted).

We address each of Woodland's arguments below.

9

**I.      The district court did not abuse its discretion by admitting the 911 call.**

Woodland contends that the district court abused its discretion by admitting the 911 call, maintaining that the call does not meet the excited-utterance exception to the hearsay rule and that its admission violated his constitutional right to confrontation of witnesses. We are not persuaded.

**A.      The 911 call was admissible as an excited utterance.**

Hearsay is an out-of-court statement, made by a declarant, that is offered to prove the truth of the matter asserted. Minn. R. Evid. 801(c). Generally, hearsay statements are inadmissible at trial, unless an exception applies. Minn. R. Evid. 802. Under Minnesota Rule of Evidence 803(2), an exception to the general hearsay prohibition exists for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale for the exception "stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement." *State v. Daniels*, 380 N.W.2d 777, 782 (Minn. 1986) (quoting Minn. R. Evid. 803(2) 1977 comm. cmt.).

A statement must meet three requirements to qualify as an excited utterance: (1) "there must be a startling event or condition"; (2) "the statement must relate to the startling event or condition"; and (3) "the declarant must be under a sufficient aura of excitement caused by the event or condition to insure the trustworthiness of the statement." *Id.* (quoting Minn. R. Evid. 803(2) 1977 comm. cmt.). "[N]o strict temporal guidelines exist for admitting an excited utterance, but the statement must have been made while the declarant was under the stress of excitement from a startling event." *State v. Tapper*, 993

N.W.2d 432, 437 (Minn. 2023) (quotation omitted). "In reaching this decision the judge must consider all relevant factors including the length of time elapsed, the nature of the event, the physical condition of the declarant, [and] any possible motive to falsify[]." *Daniels*, 380 N.W.2d at 782-83 (quoting Minn. R. Evid. 803(2) 1977 comm. cmt.).

Here, the parties neither dispute that a startling event occurred nor that N.R.'s call related to that event. Rather, Woodland disputes whether N.R. was under the aura of excitement when she made the 911 call. The district court implicitly determined that N.R. was under such an aura when it characterized N.R. as angry, fearful, and frustrated. Woodland, however, asserts that N.R.'s statements were not made under an aura of excitement for three reasons. First, although N.R. was angry, she was speaking clearly during the 911 call. Second, N.R. was not injured, she was not in danger of being hurt, and she denied needing any medical attention. Third, N.R. was not interested in meeting with the responding police officers.

Based on our careful review of the 911 call and the district court's reasoning in deciding to admit it, we conclude that the district court did not abuse its discretion by determining that N.R. was fearful, angry, and frustrated at the time of the call. In the 911 recording, N.R. can be heard speaking quickly, loudly, and over the dispatcher. N.R. calls Woodland a "motherf-----" and a "stupid b--ch," evincing her frustration and anger. N.R. also states that she is "tired of going through this sh-t with [Woodland]" and that she does not "f---ing deserve this[,]" further reflecting her fear and frustration.

Other relevant factors favor a determination that N.R.'s statements in the 911 call were excited utterances. *See Daniels*, 380 N.W.2d at 782-83. N.R.'s statements to the

11

dispatcher—that "Woodland *just* threw a brick at" her, that he was "*just* arguing at" her, that she "*just* gave him a hundred dollars" and he was "telling [her] to leave," and that "[h]e *just* threw a brick at [her] legs"—show that N.R. made the statements close in time to when the startling event occurred. The nature of the event—being on the receiving end of a "heavy-a-- brick"—would be startling to anyone. And given the nature of the call, how quickly N.R. was speaking, and how N.R. explained her relationship with Woodland, the possibility of N.R. having a motive to falsify is limited.

Woodland seeks to analogize the 911 call with statements made in *Tapper*, where the supreme court held that the excited-utterance exception did not apply. But *Tapper* is distinguishable.

In that case, police officers responded to a domestic disturbance 911 call and found the victim locked out of her apartment. *Tapper*, 993 N.W.2d at 434-35. The victim reported that the defendant had assaulted her, recounted what had happened, and described prior incidents as well. *Id.* The victim's statements were recorded by an officer's body-worn camera. *Id.* The district court granted the defendant's motion to suppress the beginning minutes of the recording. *Id.* at 436. In doing so, the district court reasoned that the victim's statements were not excited utterances because, although the victim was "downcast and sad, [she] was not 'agitated, shaky, or afraid,' and enough time had passed since the alleged assault . . . for [the victim] to 'conjecture that [the defendant] may have fallen asleep[,]'" which the district court relied on in determining that the victim was not under the aura of excitement when she made the statements. *Id.* at 436-38.

The supreme court held that the record supported the district court's ruling that the excited-utterance exception did not apply based on the victim's unexcited demeanor and the passage of enough time to allow the victim to suggest that the defendant had fallen asleep. *Id.* at 438. Observing that "it [was] unclear how much time had passed since the alleged assault" and that the victim "appeared to grow calmer as the interaction with [the officer] continued[,]" the supreme court concluded that the district court did not abuse its discretion by excluding the video. *Id.* at 438-39.

The same circumstances, however, are not present here. N.R. was under the aura of excitement while she was making the 911 call. As mentioned above, N.R. spoke quickly, loudly, and over the dispatcher, and she presented as angry and frustrated while making the call. Moreover, a significant amount of time had not passed to have allowed N.R. to assume that Woodland had fallen asleep, as in *Tapper*. Thus, we conclude that *Tapper* is distinguishable, and the district court here did not abuse its discretion by determining that the excited-utterance exception applies to the 911 call.

## B. Admission of the 911 call did not violate Woodland's constitutional right to confront witnesses.

While evidentiary rulings are within the district court's discretion, whether the admission of evidence violates a defendant's rights under the Confrontation Clause is a question of law that appellate courts review de novo. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn. 2006).

"The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees that every criminal defendant 'shall enjoy the right . . . to be

confronted with the witnesses against him.'" *State v. Wright*, 726 N.W.2d 464, 472 (Minn. 2007). "In *Crawford*, the Supreme Court interpreted this clause to bar admission of 'testimonial statements' made by a declarant out of court[.]" *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). When determining whether a statement is testimonial, this court considers the primary purpose of the investigation. *Id.* Statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Statements are nontestimonial when "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.*

The Minnesota Supreme Court has "articulated the factors used to determine when a testimonial statement is admissible because it was made during an ongoing emergency[.]" *State v. Sutter*, 959 N.W.2d 760, 767 (Minn. 2021). Those factors are:

> (1) the [person] described events as they actually happened and not past events; (2) any "reasonable listener" would conclude that the victim was facing an ongoing emergency; (3) the questions asked and answers given were necessary to resolve a present emergency, rather than only to learn what had happened in the past; and (4) there was a low level of formality in the interview because the [person's] answers were frantic and [their] environment was not tranquil or safe.

*Id.* (alteration in original) (quoting *State v. Warsame*, 735 N.W.2d 684, 690 (Minn. 2007)).

Woodland contends that the purpose of N.R.'s call was to "establish past events, not to address an ongoing emergency." He asserts that, to the extent there was an emergency, it had concluded by the time N.R. called 911. And Woodland notes that N.R. was walking home, that she was uninjured, that she refused medical attention, and that she did not ask

14

for police assistance. The state counters that N.R.'s statements were made to meet an ongoing emergency. The state argues that N.R. was describing her contemporaneous experience and that she was fleeing her assaultive partner, who remained a danger to her. The state maintains that a reasonable listener would have construed N.R.'s call as a plea for intervention because N.R. requested that police speak with Woodland. The state contends that most of N.R.'s statements described the assault that had just occurred. And the state asserts that N.R.'s request that officers speak with Woodland about his behavior "clearly indicate[d] that [N.R.] intended the police encounter to be informal and *not* lead to future litigation."

We conclude that the district court did not violate Woodland's constitutional right to confrontation of witnesses by admitting the 911 call. In the recording, N.R. tells the dispatcher about something that had just happened to her. Indeed, the call appears to have taken place soon after the incident occurred. Although N.R. was walking away from Woodland at the time of the call, the facts that N.R. was speaking quickly and that Woodland had not been apprehended support a determination that N.R. was facing an ongoing emergency. While N.R. offered information about other past events, the dispatcher did not ask follow-up questions about what had occurred and instead posed inquiries necessary to meet the ongoing emergency. For instance, the dispatcher asked where N.R. and Woodland were located, for Woodland's name and description, and whether N.R. believed Woodland was still in the home. And the formality of the call was low because N.R. spoke over the dispatcher, she did not immediately answer the dispatcher's questions, and the telephonic interaction lacked the structure of a police interrogation.

15

Because we conclude that the primary purpose of N.R.'s statements was to meet an ongoing emergency, the district court did not violate Woodland's constitutional right to confrontation by deciding to admit the 911 call. *See Davis*, 547 U.S. at 822; *see also Wright*, 726 N.W.2d at 472.

**II.     The district court did not abuse its discretion by admitting the Facebook Live video.**

Woodland argues that the district court abused its discretion by admitting the Facebook Live video. He contends that his statements in the video were inadmissible hearsay, and that, even if his statements were not hearsay, they were unfairly prejudicial. We are unconvinced.

Generally, hearsay statements are inadmissible at trial. Minn. R. Evid. 802. But a statement by a party-opponent is not hearsay if "the statement is offered against a party" and "is the party's own statement, in either an individual or a representative capacity." Minn. R. Evid. 801(d)(2)(A). "Statement" is defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Minn. R. Evid. 801(a). In the Facebook Live video, Woodland made "oral assertions" about his anger and frustration, and the state offered the video as evidence against Woodland to establish his state of mind. The Facebook Live video is therefore not inadmissible hearsay because it is admissible as a statement by a party-opponent.

That being the case, the only remaining question is whether the district court erred in concluding that the Facebook Live video was more probative than prejudicial. Minnesota Rule of Evidence 403 states in part that, "[a]lthough relevant, evidence may be excluded if

16

its probative value is substantially outweighed by the danger of unfair prejudice[.]" Generally, "[e]vidence has probative value when it, in some degree, advances the inquiry." *Doe 136 v. Liebsch*, 872 N.W.2d 875, 880 (Minn. 2015) (quotation omitted). "Unfair prejudice under rule 403 is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Schulz*, 691 N.W.2d 474, 478 (Minn. 2005).

Woodland maintains that the video was unfairly prejudicial to him because his theory—that he accidentally stabbed N.R.—was plausible and not challenged by the medical examiner. He asserts that, after viewing the video, the jury rejected any consideration of his defense. The state argues that the video was highly probative for four reasons. First, the video directly contradicted Woodland's argument that N.R.'s death was an unforeseeable accident. Second, Woodland made statements in the video that were directly related to several events between Woodland and N.R. immediately preceding N.R.'s death. Third, Woodland stated in the video that anyone who came between him and his drugs or money would be harmed, which directly relates to Woodland's claim that he did not want to supply N.R. with more drugs, despite her desire for them. And fourth, Woodland recorded the video two days before the murder, and he acknowledged in his trial testimony that he binged on drugs from April 6 to when the stabbing incident occurred on April 7. On those bases, the state reasons that Woodland's statements directly expressed his then-existing intent and state of mind.

We agree with the state that the video has probative value, as it establishes Woodland's mental state only two days before N.R.'s death. It is also unlikely that the

17

video gave the state an "unfair advantage" because Woodland testified about the video at trial. Woodland stated that he was very high at the time of the video and that he was not proud of it. Woodland also countered the evidence by claiming that his anger in the video was not aimed at N.R. Instead, Woodland said that he had intended to direct his anger towards N.R.'s twins' father. And rather than rejecting any consideration of Woodland's defense upon watching the Facebook Live video, the jury received all admitted evidence and heard arguments from both sides before reaching a verdict. The video therefore did not give the state an "unfair advantage that result[ed] from the capacity of the evidence to persuade by illegitimate means." *Liebsch*, 872 N.W.2d at 880 (quotation omitted).

Moreover, the Committee Comment to Rule 403 emphasizes that the rule "favors the admission of relevant evidence by requiring a determination that its probative value be 'substantially' outweighed by the dangers listed in the rule before relevant evidence will be excluded." Minn. R. Evid. 403 1977 comm. cmt. Here, the Facebook Live video might have had a prejudicial effect on Woodland by depicting unfavorable personal characteristics. But the probative value of the video is not "substantially" outweighed by the danger of unfair prejudice. We therefore conclude that the district court did not abuse its discretion in determining that the Facebook Live video was more probative than prejudicial and in deciding to admit the video into evidence.

**Affirmed.**